In re William Krag BROTBY, Debtor.

Computer Task Group, Inc., Appellant,

v.

William Krag Brotby, Appellee.

BAP No. CC–03–1081–PaPMa.
Bankruptcy No. LA–01–41339 ES.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted on July 24, 2003.

Filed Nov. 7, 2003.

Randy P. Orlick, Cox, Castle & Nicholson, LLP, Los Angeles, CA, for Computer Task Group, Inc.

N. Jane DuBovy, Law Offices of N. Jane DuBovy, Pacific Palisades, CA, for William Krag Brotby.

Before PAPPAS,[1] PERRIS and MARLAR, Bankruptcy Judges.

## OPINION

PAPPAS, Bankruptcy Judge.

Debtor William Krag Brotby's Third Amended Chapter 11 Plan (hereinafter "Plan") was confirmed by the bankruptcy

1. Hon. Jim D. Pappas, Chief Bankruptcy Judge, District of Idaho, sitting by designation.

court. A creditor, Computer Task Group, Inc. (hereinafter "CTG"), argues that the bankruptcy court committed several errors in deciding to confirm Debtor's Chapter 11 plan, which treated one member of a class of unsecured creditors differently than other members, enjoined a creditor from collecting on a nondischargeable debt while Debtor made payments on that debt through the plan, and treated the individual Debtor's contribution of exempt property as "new value" in order to satisfy an exception to the "absolute priority rule" in 11 U.S.C. § 1129(b). We REVERSE and REMAND the case to the bankruptcy court for further proceedings.

## BACKGROUND

Debtor is a computer security consultant. From 1995 until April, 1997, Debtor worked for CTG. During this time, as an employee of CTG, Debtor provided consulting services to a company in Alaska. After leaving CTG's employment, Debtor continued to provide the Alaskan company with consulting services, although on an independent basis. CTG filed suit against Debtor in federal district court in Alaska, alleging Debtor's continued relationship with the Alaskan company violated Debtor's employment contract with CTG. The district court eventually entered judgment against Debtor on October 1, 2001, awarding damages of $132,000 plus $167,250 in attorney fees and costs. Debtor timely appealed this judgment to the Ninth Circuit Court of Appeals, which appeal remains pending at this time.

## BANKRUPTCY COURT PROCEEDINGS

On October 18, 2001, Debtor filed a petition for relief under Chapter 7 of the

Bankruptcy Code. On February 25, 2002, Debtor's case was converted at his request to a Chapter 11 case. Debtor's bankruptcy schedules list only three secured creditors: Provident Bank of Maryland, which holds a lien on the boat Debtor uses as a residence; Jaguar Credit, which claims a lien on Debtor's vehicle; and the California Board of Equalization, which asserts a tax lien against Debtor's boat. In addition, nine unsecured nonpriority claims are listed in Debtor's schedules. Four are attorney fee claims associated with the Alaska litigation, and four appear to be for modest amounts of consumer debt. The largest unsecured claim is that of CTG, which is based upon the federal court judgment.

During Debtor's Chapter 11 case, CTG commenced an adversary proceeding against Debtor seeking a determination by the bankruptcy court that a portion of the amounts owed by Debtor under the district court judgment should be excepted from discharge pursuant to § 523(a)(6).[2] CTG obtained a judgment declaring $157,715.75 to be nondischargeable. The bankruptcy court judgment was entered on August 27, 2002.

Thereafter, Debtor and CTG negotiated and executed a stipulation providing, *inter alia*, that CTG's claim would be deemed allowed in the amount of $362,986.16 for purposes of the Chapter 11 case. The bankruptcy judge entered an order approving this stipulation on September 17, 2002. Appellant's E.R. at 517.

The bankruptcy court conducted a hearing on Debtor's proposed Second Amended Disclosure Statement on October 1, 2002. After entertaining CTG's objections to the disclosure statement, the bankruptcy court

**2.** All statutory references and references to the "Bankruptcy Code" or the "Code" are to Title 11 of the United States Code.

ordered that several additions and corrections be incorporated in a Third Amended Disclosure Statement (hereinafter "Disclosure Statement"), which Debtor filed on October 8, 2002. The Disclosure Statement contained financial projections concerning Debtor's future income, the primary source of payments under Debtor's Plan. The projections were preceded in the Disclosure Statement by a cover page indicating that this financial information was prepared by a certified accounting firm in accord with accepted national accounting standards. In fact, the accounting firm had prepared the projections contained in Debtor's earlier disclosure statement. However, a clerk employed by counsel for Debtor actually prepared the projections found in the later Disclosure Statement, with Debtor's help. For whatever reason, it appears the cover page was not removed after these revisions were made and the new Disclosure Statement was submitted to the bankruptcy court.

Although the details of the Plan are somewhat complex, for purposes of this appeal, the relevant provisions can be simply summarized. With respect to the secured creditors, Provident Bank's claim was unimpaired. The claims of both Jaguar Credit and the Board of Equalization were impaired. Jaguar Credit voted to accept the Plan and the Board did not vote. All secured creditors retained their liens and were to receive monthly payments on their claims.

The Plan treats the claims of all unsecured creditors, including CTG, in a single class, Class 5.[3] The Plan provides that all Class 5 claimants will receive 25% of the amount of their claims. Except as to the claim of CTG, Debtor agreed to make monthly installment payments to Class 5 creditors for six years commencing on the effective date of the Plan.

As to CTG, Debtor was to deposit monthly payments into a "Disputed Claim Reserve" in the form of an interest-bearing trust account. The Alaska litigation shall continue, and if CTG ultimately prevails, CTG will be entitled to the money paid into the reserve account and to any remaining payments over the six year period. In addition, in that event, Debtor will make monthly payments to CTG for two more years in order to satisfy the entire nondischargeable portion of its claim. On the other hand, if Debtor ultimately succeeds in defeating CTG's claim from the district court litigation, all amounts in the reserve account will be applied to the unpaid balances owed on the other claims in Class 5. Under these circumstances, CTG would receive nothing. The Plan also provides that CTG shall be enjoined from any attempts to collect the nondischargeable portion of its claim other than through its receipt of Plan payments.[4]

---

3. The Plan allows Class 5 unsecured creditors to elect treatment under Class 4, which limits a creditor's claim to a maximum of $10,000 and requires the creditor to accept a payment of 50% of the claim's reduced value. While one creditor apparently made such an election, the existence of Class 4 does not impact CTG's arguments as to the propriety of its treatment as a member of Class 5.

4. In this regard, the Plan provides as follows: The payments made into the DCR and as set forth in the Plan to satisfy CTG's nondis-

chargeability judgment and claim, are the only means by which CTG may collect on its judgment. Through confirmation of this Plan, CTG is specifically estopped and enjoined from collecting on its judgment outside of the confirmed plan. CTG shall be stayed from proceeding to execute on any nondischargeable judgment received unless there is a default under the Plan which has not been cured for 3 months after the initial default.

Appellant's E.R. at 778.

CTG rejected the Plan and filed an objection to its confirmation. Based upon CTG's rejection, Class 5 did not accept the Plan.[5] All other impediments to confirmation were resolved, and the only issue preventing confirmation of the Plan was CTG's objection.

The bankruptcy court conducted a confirmation hearing concerning the Plan on December 12, 2002. Prior to that hearing, CTG and Debtor had made written submissions to the bankruptcy court, and the bankruptcy judge had issued a tentative ruling on the confirmation issues. At the hearing, counsel for Debtor and counsel for CTG presented argument regarding the issues, including the erroneous inclusion of the accounting firm's cover page in the Disclosure Statement, CTG's treatment as compared to other creditors in the same class, the injunction language pertaining to CTG, application of the absolute priority rule and the new value exception, and the accuracy of the projections of Debtor's future income. After considering the arguments, the bankruptcy court ruled that the accountant's cover letter did not mislead creditors as to any material issue because Debtor had filed a declaration of the accountant stating that the figures prepared by Debtor's counsel's clerk were appropriate given certain new assumptions about Debtor's future. In addition, the bankruptcy court decided that CTG's treatment was the "same" as other Class 5 creditors and thus satisfied § 1123(a)(4), and that CTG could be enjoined from any collection activity during the pendency of the plan. However, the court continued the confirmation hearing so both parties could submit additional briefs on the applicability of the absolute priority rule and the new value exception, and to allow Debtor to submit new financial information.

The continued hearing was held on January 16, 2003. Counsel presented further argument concerning the Plan's injunction against CTG, the applicability of the new value exception, and Debtor's revised financial projections. A particular concern raised by CTG was that Debtor had by now submitted revised financial projections (hereinafter "new projections") to the bankruptcy court. While the projections contained in the Disclosure Statement showed Debtor would have positive net income during all six years of the Plan, and net earnings (*i.e.* earnings after deducting plan payments and living expenses) of approximately $600,000 at the Plan's completion, the new projections showed that Debtor would have negative net income in the first two years of the Plan and net earnings of approximately $125,000 at the end of the Plan.

Ultimately, the court overruled all CTG's remaining objections to confirmation and concluded that the Plan met the requirements of § 1129. An order confirming the Plan was entered on February 2, 2003, and CTG timely appealed.

### ISSUES ON APPEAL

CTG contends the bankruptcy court erred in confirming the Plan and raises the following issues on appeal:

---

**5.** Aside from CTG, only two other Class 5 creditors voted, and both voted to accept the Plan. However, "[a] class of claims has accepted a plan if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ...." 11 U.S.C. § 1126(c). Given the size of the claims that voted in favor of the Plan, the "two-thirds in amount" requirement was not met with respect to Class 5. The single creditor that opted into Class 4 voted to accept the Plan. No other unsecured creditors voted. Appellant's E.R. at 866.

(1) Whether the Plan violates § 1123(a)(4) in its treatment of CTG's claim;

(2) Whether the Plan's provision enjoining CTG from collecting on the nondischargeable debt owed by Debtor violates § 1141(d)(2);

(3) Whether the Plan was feasible pursuant to § 1129(a)(11);

(4) Whether the disclosure statement was materially misleading;

(5) Whether Debtor may invoke the new value exception to the absolute priority rule embodied in § 1129(b)(2), and if so, whether the Plan satisfied the new value exception; and

(6) Whether the Plan was proposed in good faith.

## STANDARD OF REVIEW

■ The ultimate decision to confirm a reorganization plan is reviewed for an abuse of discretion. *First Fed. Bank of California v. Cogar (In re Cogar)*, 210 B.R. 803, 808 (9th Cir. BAP 1997) ("An order approving a reorganization plan is reviewed for an abuse of discretion."); *cf. Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir.1994) (stating a finding of bad faith is reviewed for clear error while the decision to dismiss based on bad faith is reviewed for abuse of discretion). A bankruptcy court abuses its discretion if it applies the law incorrectly or if it rests its decision on a clearly erroneous finding of a material fact. *United States v. Peninsula Communications, Inc.*, 287 F.3d 832, 839 (9th Cir.2002); *Gonzalez v. Gottlieb (In re Metro Fulfillment, Inc.)*, 294 B.R. 306, 309 (9th Cir. BAP 2003).

■ Of course, a determination that a plan meets the requisite confirmation standards necessarily requires a bankruptcy court to make certain factual findings and interpret the law. Whether a claim receives the same treatment as other similarly classified claims presents a question of fact reviewed for clear error. *In re Stolrow's, Inc.*, 84 B.R. 167, 172 (9th Cir. BAP 1988) (citing *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1358 (9th Cir.1986)). Clear error exists only when the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Milenbach v. C.I.R.*, 318 F.3d 924, 935 (9th Cir.2003) (internal quotations and citations omitted). In addition, factual determinations made in regard to feasibility under § 1129(a)(11) and good faith under § 1129(a)(3) are also reviewed for clear error. *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (finding clear error in confirmation of a plan that failed to estimate or account for a major potential claim against the estate); *In re Marsch*, 36 F.3d at 829 (reviewing finding of bad faith for clear error). And while compliance with the disclosure requirements of § 1125 may be a mixed question of law and fact, to the extent factual issues are appealed, as in this case, the proper standard of review is clear error. *See In re California Fidelity, Inc.*, 198 B.R. 567, 570 (9th Cir. BAP 1996) (noting whether § 1125(b) has been violated is a mixed question of law and fact reviewable *de novo*, but that issues identifiable as solely factual are reviewed for clear error).

■ Whether the bankruptcy court correctly interpreted § 1141 is a question of law reviewed *de novo*, as is its construction of § 1129(b) allowing individual debtors to utilize the new value exception to the absolute priority rule. *In re Su*, 290 F.3d 1140, 1142 (9th Cir.2002).

## DISCUSSION

### A. Providing class members the "same treatment" under § 1123(a)(4).

■ To be confirmed, the Code requires that a plan "provide the same treatment

for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). CTG argues that the Plan violates this provision because, unlike the other Class 5 creditors who will receive payments commencing shortly after confirmation, CTG will not receive any payments on its claim pending the final resolution of the Alaska litigation. Debtor argues that CTG's treatment is appropriate because the Plan attempts, as much as practicable, to provide CTG the same benefits as other members of Class 5, while preserving Debtor's right to continue the pending appeal of the district court judgment.

At the outset, it is important to note that the text of § 1123(a)(4) mandates that a confirmable plan provide the "same treatment" for class members. The Supreme Court has instructed lower courts to apply the plain language of the Bankruptcy Code. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000); *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240–41, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). While bankruptcy courts may have some latitude in determining whether class members are receiving the same treatment, *see, e.g., In re AOV Indus., Inc.*, 792 F.2d 1140, 1154 (D.C.Cir.1986) (clarifying that the holding of the case did not require all class members to be treated in precisely the same manner), that latitude is constrained by the language employed by Congress in § 1123(a)(4).

Two cases are particularly helpful to an interpretation of this Code provision. In *In re Smith*, 123 B.R. 863, 865 (Bankr. C.D.Cal.1991), the debtor placed the claim of a plaintiff in a lawsuit against the debtor in the same class with all other unsecured creditors. *Id.* at 865. The plan proposed to pay unsecured creditors in full within thirty days of confirmation, except for the plaintiff-creditor and the holder of one other "disputed" claim. These two creditors were to receive nothing under the plan, but would retain the right to pursue their causes of action outside of the bankruptcy forum. *Id.* Later, the debtor proposed to modify this plan, leaving the plaintiff-creditor as the only class member who would not be paid shortly after confirmation. In response to this proposed modification, the bankruptcy court said "[the plaintiff-creditor's treatment] alone, is enough to deny the Debtor confirmation of her plan, for it violates the dictates of 11 U.S.C. § 1123(a)(4) which requires that all claims within a given class receive 'the same treatment.'" *Id.*

Another case discussing this issue is *In re Planet Hollywood Int'l*, 274 B.R. 391 (Bankr.D.Del.2001). In *Planet Hollywood*, the confirmed plan required payment of only allowed claims, defined as claims that were allowed by a final order no longer subject to appeal. *Id.* at 398. The debtor did not make payments to a particular unsecured creditor because the debtor appealed an order allowing that creditor's claim. *Id.* The creditor moved to modify the plan such that its claim would be paid immediately, or that payments to it would be put in escrow until the appeal was completed. *Id.* The bankruptcy court rejected this proposed modification because, among other things, it treated one creditor with a "disputed claim" differently than other creditors with "disputed claims," and, therefore, violated § 1123(a)(4). *Id.* at 400.

Here, the Panel need not precisely define the extent of latitude that the bankruptcy court may employ in reviewing the treatment of claims of unsecured creditors within a particular class because under any

acceptable standard the Plan's treatment of CTG's allowed, unsecured claim fails to meet the strictures of § 1123(a)(4). Recall, in this case the bankruptcy court entered an order approving the parties' express stipulation that CTG's claim in the amount of $362,986.16 would be deemed allowed for "purposes of this Chapter 11 bankruptcy . . . ." Appellant's E.R. at 517. In other words, the parties agreed, and the bankruptcy court ordered that, regardless of the pending litigation, for all purposes in the Chapter 11 case CTG would be treated as an unsecured creditor holding an allowed claim. Under these circumstances, Debtor cannot now argue that CTG's claim should be subjected to different treatment than other similarly classified, allowed unsecured claims.

The different manner in which CTG's claim is treated under the Plan as compared to other claims in Class 5 is significant, and therefore cannot be seen as consistent with the command of § 1123(a)(4) in light of the court's order allowing CTG's claim. *In re Planet Hollywood Int'l,* 274 B.R. at 400; *In re Smith,* 123 B.R. at 865. Other unsecured creditors will have immediate access to Debtor's payments under the Plan. By depositing CTG's payments into a trust account for subsequent distribution at some undetermined and potentially distant date, if at all, CTG enjoys no benefit from the use of these funds. In light of the parties' stipulation, and under either a strict or liberal construction of § 1123(a)(4), the Plan's treatment of CTG's allowed unsecured claim is sufficiently dissimilar to conclude that it is not the "same treatment" given to other unsecured creditors.

To be clear, the problem with Debtor's Plan is not its use of a "disputed claim

reserve" *per se,* or that it attempted to use a mechanism to delay distribution as to claims not yet allowed for some reason. Rather, here the Plan singled out one member of a class for disparate treatment despite the fact that the bankruptcy court had ordered the claim be allowed for all purposes based on the Debtor's stipulation. Assuming that the facts giving rise to CTG's claim and its rights as a creditor are substantially different from those of the other claimants in Class 5, and that the difference is significant enough to justify Debtor's dissimilar treatment of CTG's claim, the Code requires that CTG's claim be separately classified. Section 1122(a) provides that "a plan may place a claim or an interest in a particular class *only if such claim or interest is substantially similar to the other claims or interests of such class.*" (emphasis added). If Debtor is correct in arguing that the nature of CTG's claim warrants disparate treatment, Debtor should have separately classified CTG's claim in the Plan.

Under these facts, the bankruptcy court clearly erred in concluding that treatment of CTG's claim under the Plan complied with § 1123(a)(4), and for that reason the order confirming the Plan must be reversed.

### B. Section 1141(d)(2) and the Plan's injunction against collection of CTG's nondischargeable debt.

In the adversary proceeding, the bankruptcy court declared a significant portion of CTG's claim excepted from discharge under § 523(a)(6). The Code dictates that "confirmation of a plan does not discharge an individual debtor from any debt excepted from discharge under section 523 . . . ." 11 U.S.C. § 1141(d)(2).[6] CTG contends

---

6. Section 1141 provides in relevant part:

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a

the Plan violated § 1141(d)(2) by providing that CTG could not pursue any collection activity concerning the nondischargeable portion of its claim "outside of the Plan" after confirmation. *See supra* n. 4. Debtor points out that, assuming CTG prevails in the district court litigation, the Plan provides that the nondischargeable component of CTG's claim will be paid in full. Therefore, Debtor argues the Plan is consistent with the requirements of the Code.

■ Whether a plan may enjoin a creditor holding a nondischargeable claim from collection while the debtor makes payments to other creditors under the plan has been a point of some controversy in the courts in the Ninth Circuit and elsewhere. Clearly, under § 1141(d)(2), confirmation of a plan does not operate to discharge an otherwise nondischargeable debt. But here, the Plan does not propose to discharge CTG's nondischargeable claim. Instead, it postpones CTG's ability to collect on its claim while Debtor is making payments, until Debtor has paid the nondischargeable debt in full or until Debtor defaults in making those payments. At the same time, Debtor's nonexempt income and assets are shielded from seizure by CTG so they may be devoted to paying the claims of all creditors treated by the Plan.

The debate surrounding the proper interpretation of § 1141(d)(2) was acknowledged by the bankruptcy court in *In re Mercado*, 124 B.R. 799, 801–03 (Bankr. C.D.Cal.1991). Under what the court referred to as the "limited approach" to construing the statute, § 1141(d)(2) can be read to only preclude a reorganization plan from *discharging* nondischargeable debt; the provision should not restrict a plan from temporarily enjoining collection of a nondischargeable debt if the delay is "necessary for the success of the plan and the other requirements of § 1129 are satisfied." *Id.* at 803. In contrast, the "broad view" of § 1141(d)(2) is that the provision "excepts a nondischargeable debt from any effects of the plan." *Id.* at 801. Attempting to apply the plain language of § 1141(d)(2), and for other reasons, the bankruptcy court was "unwilling to find the injunction in the Plan provision ... per se inconsistent with § 1141(d)(2)." *Id.* at 805.

*Collier* supports the "limited approach" applied in *Mercado*. 8 Lawrence P. King, *Collier on Bankruptcy* ¶ 1141.05[2] (15th ed. rev.2001). The treatise explains:

One question that has arisen is whether a plan may provide for an injunction against collection of a nondischargeable debt when the plan provides for payment in full over time. Some courts

confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan ... (c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and

interests of creditors, equity security holders, and of general partners in the debtor. (d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan— (A) discharges the debtor from any debt that arose before the date of such confirmation ... (B) terminates all rights and interests of equity security holders and general partners provided for by the plan ... (2) The confirmation of a plan does not discharge an individual debtor from any debt excepted from discharge under section 523 of this title.

have approved injunctions that, in effect, require the creditor to await payment under the plan even though the creditor's claim is nondischargeable. However, such an injunction may harm the creditor with the nondischargeable claim by preventing it from taking action to collect its claim at a time when the debtor has assets from which the claim could be collected. Nevertheless, when the court has sufficient confidence that the debtor's plan is feasible, and performance under the plan requires that creditors participate collectively, it may be appropriate to enjoin individual collection efforts. In the event that the plan fails, the creditor's claim would most likely remain nondischargeable in a subsequent case.

*Id.* In addition, other bankruptcy courts have endorsed this approach. *See Martin v. United States (In re Martin),* 150 B.R. 43, 46–47 (Bankr.S.D.Cal.1993) (agreeing with *Mercado* ).

The legislative history of § 1141 further supports *Mercado* and a limited interpretation of the statute. Addressing § 1141(d) generally, a congressional report notes:

Subsection (d) contains the discharge for a reorganized debtor. Paragraph (1) specifies that the confirmation of a plan discharges the debtor from any debt that arose before the date of the order for relief ... [P]aragraph [ (1) ] permits the plan or the order confirming the plan to provide otherwise, and excepts certain debts from the discharge as provided in paragraphs (2) and (3).

United States Senate, Report of the Committee on the Judiciary, S.Rep. No. 95–989, at 130 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5915. One member of Congress explained:

Under the provisions of section 1141 as revised by the House amendment, an individual in reorganization under chapter 11 will not be discharged from any debt, including prepetition tax liabilities, which are nondischargeable under section 523. Thus, an individual debtor whose plan of reorganization is confirmed under chapter 11 will remain liable for prepetition priority taxes, as defined in section 507 ... and for tax liabilities ... [that] are nondischargeable under section 523 ....

124 Cong. Rec. H11114 (daily ed. Sept. 28, 1978) (statement of Congressman Edwards). Finally, and perhaps most tellingly, debate in the Senate explained that, in reference to § 1141(d)(2):

[I]t is necessary for a corporation or partnership undergoing reorganization to be able to present its creditors with a fixed list of liabilities upon which the creditors or third parties can make intelligent decisions. Retaining an exception for discharge with respect to nondischargeable taxes would leave an undesirable uncertainty surrounding reorganizations that is unacceptable.

124 Cong. Rec. S17422 (daily ed. Oct. 6, 1978) (statement of Senator DeConcini).

Considering these excerpts of legislative history in concert, it appears § 1141(d)(2) was intended to make clear that a debtor will remain obligated to pay nondischargeable debts after plan confirmation, tax debts in particular. There is no indication that the statute was intended to prohibit a temporary restriction on the collection activities of creditors holding nondischargeable claims.

Recently, another Panel addressed a similar, but significantly different issue. In *In re Bartleson,* 253 B.R. 75 (9th Cir. BAP 2000), the Panel ruled that:

Under the facts of this case, (1) where Debtor did not specifically include an injunctive provision in his Plan, (2)

where Debtor failed to dedicate his Non–Plan Assets to fund the Plan, and (3) where the Creditors did not take any action which should estop them from pursuing collection activity, the panel will follow *DePaolo* [45 F.3d 373 (10th Cir.1995)] and the majority line of cases, and hold that the confirmed plan does not preclude Creditors from collecting their nondischargeable claim outside the bankruptcy.

*Id.* at 84. The Panel noted that *Mercado* involved a plan with specific injunction language, whereas in the case before the Panel, no such injunction was included in the plan. *Id.* at 83. However, in apparent *dicta*, the *Bartleson* Panel criticizes the "limited approach" to interpreting § 1141(d)(2), and suggests a narrow interpretation of the statute is inappropriate based upon a consideration of § 1141 as a whole. The Panel observes:

> If the only exception were ·contained within the confines of section 1141(d)-but not in subsections (a) and (c)-*Mercado's* reasoning would be persuasive. Section 1141(d) explicitly provides that a discharge is not available through a confirmed plan with respect to a nondischargeable debt. If Congress' goal was solely to shield nondischargeable debts from a chapter 11 discharge, the exception contained in section 1141(d) would have been sufficient.
>
> Congress, however, also carved an 1141(d)(2) exception to the general precepts contained in sections (a) and (c) regarding the binding effect of a plan and regarding the right of a debtor to retain property free and clear of all claims of creditors. *Mercado's* interpretation effectively treats the exceptions contained in subsections (a) and (c) of section 1141 as surplusage.

*Id.* at 80.

This Panel must respectfully disagree with these comments and the corresponding reasoning of *Bartleson.* Section 1141(d)(2) plainly limits the discharge of debts provided to individual debtors in § 1141(d)(1). The reference to § 1141(d)(2) in § 1141(a) makes it clear that while all creditors are bound by the provisions of a confirmed plan, this binding effect cannot operate to discharge an otherwise nondischargeable debt. Similarly, by reference to subsection (d)(2) in § 1141(c), Congress instructs that while confirmation of a plan releases all property dealt with by the plan from the claims of creditors, the plan cannot release property from § 523 claims. The *Mercado* court's approach to construction of § 1141(d)(2) does not render the references to that statute in §§ 1141(a) or (c) superfluous. As the *Mercado* court observed, § 1141(d)(2) was intended by Congress to answer the question *whether* after confirmation of a plan a creditor can collect a nondischargeable claim, not *when.* 124 B.R. at 804.

The bankruptcy court's reasons for adopting a narrow reading of § 1141(d)(2) in *Mercado* are consistent with the bankruptcy policy favoring a fresh start for the debtor, while giving appropriate protection to the rights of creditors. This interpretation encourages flexibility for debtors attempting to reorganize, and may serve as an incentive to pursue confirmation of a plan instead of liquidation. At the same time, creditors, including those holding nondischargeable claims, are protected by the confirmation standards. In practice, as here, nondischargeable claims are paid in full, while other creditors also receive a benefit. An interpretation of § 1141(d)(2) that an individual debtor's plan can in no fashion modify the rights of a creditor holding a claim excepted from discharge would effectively grant that creditor a veto over the reorganization process. If a cred-

itor holding a nondischargeable claim could not be temporarily prevented by a plan from pursuing collection, even where the creditor will be paid in full over time, that creditor is "in a position to undercut a debtor's attempt to reorganize, possibly harming other creditors who might benefit from the proposed plan." *Id.* at 803.

The bankruptcy court in *Mercado* invoked its equitable powers under § 105 to sustain a plan injunction against collection of nondischargeable debts. *Id.* at 803 ("the bankruptcy court has the power to find that an injunction in the plan is appropriate should it be necessary for the success of the plan ...."). Arguably, the provisions of Chapter 11 authorize the imposition of an injunction in this context. Section 1123(b)(1) provides that a debtor's plan may impair, or in other words, modify the rights of creditors. Under § 1123(b)(6), a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [title 11]." Above, it is explained how a plan provision temporarily enjoining collection by a creditor holding a claim excepted from discharge is not inconsistent with § 1141(d)(2). Nor is such a provision inconsistent with any other provision of the Code. And if a plan containing such an injunction is confirmed, the plan provision would be binding upon creditors under § 1141(a). In this sense, then, it can be argued that the provisions of Chapter 11 allow an injunction in a plan that limits the collection of nondischargeable claims while the debtor makes payments to all creditors, and which will eventually pay the nondischargeable claim in full.

However, as observed by the *Mercado* court, even if the provisions of Chapter 11 do not expressly authorize the imposition of a collection injunction in a Chapter 11 plan, § 105(a) [7] provides ample statutory authority for the bankruptcy court's approval of a such an injunction, provided a proper showing is made by the plan proponent to support such relief.

Under the equitable analysis implicated by § 105(a), to establish the propriety of a collection injunction, the debtor must prove that it is necessary to allow the debtor to successfully reorganize and to perform the terms of the Chapter 11 plan. The injunction must also be tailored in duration and scope to afford the necessary relief to the debtor while not placing unnecessary restrictions on the target creditor's rights. In this regard, the debtor must demonstrate that the injunction does not prevent, but merely postpones, the creditor's collection of the nondischargeable claim in full pending debtor's performance of the plan. In addition, the injunction should be effective only as long as the debtor is properly performing and complying with the terms of the plan. If the debtor fails to make plan payments or engages in conduct that unfairly frustrates the rights of the creditor to collect its claim (*e.g.* by improperly conveying away assets), the creditor should be allowed relief from the collection injunction.

Finally, since § 105(a) represents a grant of equitable power, before approving an injunction, the bankruptcy court must always balance the relative hardships on the debtor and creditor and con-

---

7. 11 U.S.C. § 105(a) provides:
 The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

clude that the equities favor imposition of the injunction and confirmation of the plan. In some cases, even though it may appear that a narrowly tailored collection injunction is necessary to the debtor's successful reorganization, postponing the creditor's right to collect from the debtor may so harm or prejudice the creditor as to render the use of an injunction unfair. Likewise, unless the debtor is restricted by the injunction or otherwise from using property outside the ordinary course of the debtor's financial affairs (*e.g.*, conveying or encumbering property), the relative hardships may balance against approving the injunction.

Here, the Plan did not propose to discharge any portion of CTG's nondischargeable claim. Instead, that portion of CTG's claim would be paid in full. The bankruptcy court correctly concluded that the Plan, which enjoined CTG from attempting to collect the nondischargeable component of its claim, did not violate § 1141(d)(2).

 However, the bankruptcy court failed to make the necessary specific findings of fact to support imposition of the injunction in this case. The bankruptcy court did not address why the inclusion of the collection injunction against CTG in Debtor's Plan was "necessary for the success of the plan." *Mercado*, 124 B.R. at 803. Perhaps since Debtor is funding his plan in large part from his earnings, if CTG were allowed to pursue collection of its claim "outside" the Plan, Debtor's ability to complete the Plan and to reorganize may be jeopardized and the rights of creditors adversely impacted. If those circumstances in fact exist, delaying CTG's collection efforts may be reasonably necessary to the success of Debtor's Plan. But the record at this point does not include such findings.

On this record, it is also unclear whether the bankruptcy court engaged in any balancing of the relative hardships resulting from the imposition of the collection injunction, or whether it agreed that the scope and duration of the collection injunction was properly limited in the Plan so as to not unfairly prejudice the creditor. As discussed above, such findings are the necessary foundation to the bankruptcy court's use of its equitable powers under § 105(a).

While the bankruptcy court correctly interpreted § 1141(d)(2), absent appropriate factual findings to support the use of the collection injunction in this case, the matter must be remanded to the bankruptcy court. *Norris v. City and County of San Francisco*, 900 F.2d 1326, 1329 (9th Cir. 1990) (remanding when trial court findings were not sufficiently clear to permit adequate review).

## C. Did the bankruptcy court correctly determine that Debtor's Plan was feasible?

The Bankruptcy Code requires that a court confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This condition for confirmation is often referred to as the "feasibility" requirement.

 To demonstrate that a plan is feasible, a debtor need only show a reasonable probability of success. *Acequia*, 787 F.2d at 1364. The Code does not require the debtor to prove that success is inevitable, *In re WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr.D.Or.2002), and a relatively low threshold of proof will satisfy § 1129(a)(11), *In re Sagewood Manor Assocs. Ltd.*, 223 B.R. 756, 762 (Bankr.D.Nev. 1998), so long as adequate evidence supports a finding of feasibility. *See In re Pizza of Hawaii, Inc.*, 761 F.2d at 1382

(reversing where feasibility determination excluded consideration of major claim).

■ CTG argues the Plan is not feasible using either the projections in the Disclosure Statement or the new projections, and that the bankruptcy court erred in finding that the Plan was feasible. Specifically, the projections in the Disclosure Statement assumed Debtor's income would increase 10% per year, compounded annually, and that Debtor, who is sixty years old, would be able to continue working over the next eight years in order to complete all Plan payments to CTG. The new projections, submitted after the first confirmation hearing, increased some of Debtor's expenses and eliminated the 10% annual increase as to Debtor's income from a computer security and asset recovery firm in which Debtor holds a one-third ownership interest. These new projections also predict Debtor will encounter deficits in the first two years of the Plan. CTG argues there is nothing in the evidentiary record to support these revised assumptions.

CTG can legitimately criticize Debtor's tactic in submitting the new projections only after the balloting on the Plan was completed and CTG had lodged its objection to the feasibility of the Plan. Arguably, Debtor's new, lower projections of net income helped him demonstrate that a contribution of his nonexempt pension funds was necessary to the success of the Plan and therefore satisfied the new value exception to the absolute priority rule, as discussed below. However, while the new projections could be suspect, the bankruptcy court's finding that Debtor's Plan was feasible based upon the new information was not erroneous.

Even under the new projections, which predict substantially lower levels of income for Debtor over the duration of the Plan, sufficient funds are available for Debtor to make plan payments and meet other living expenses. Moreover, these projections are accompanied by a declaration from Debtor's accountant attesting to their accuracy and reliability.[8] In other words, there was an adequate basis in the evidentiary record to support the bankruptcy court's finding that Debtor would be able to make the Plan payments.

■ While Debtor's age may have been a relevant factor in assessing feasibility of the Plan in this case, *see In re Howard,* 212 B.R. 864, 882 (Bankr. E.D.Tenn.1997) (considering a debtor's age in assessing feasibility in a Chapter 12 case), it was not a disqualifying factor. Indeed, a finding that Debtor, a 60 year old man, will be able to continue working for six to eight years as a computer consultant seems unremarkable when compared to the 62 year old debtor in *Howard* who proposed to continue working sixteen-hour days on his farm for the next twenty years. *Id.*

In short, there was sufficient evidence in the record for the bankruptcy judge to find that Debtor's Plan was feasible. The bankruptcy judge's factual findings related to this issue do not amount to clear error.

**D. Was the Disclosure Statement so misleading as to justify denial of confirmation?**

■ CTG argues that Debtor's Plan failed to satisfy § 1129(a)(2), which requires that the proponent of a plan comply with the applicable provisions of the Code. First, CTG contends that the inclusion of

---

8. Debtor also executed a declaration containing information supporting the financial assumptions made in developing the new projections. However, at the January 16 confirmation hearing, the bankruptcy judge sustained an objection to Debtor's declaration and indicated she did not rely on this information in making her feasibility determination.

an accountant's cover letter in the Disclosure Statement directly preceding the financial information prepared by Debtor's counsel's clerk amounted to false and misleading information in violation of § 1125. Second, CTG contends that Debtor's reliance on the new projections, which are significantly different than those in the Disclosure Statement, renders the Disclosure Statement misleading.

The cover letter from Debtor's accountant stating that the new projections were prepared by the accountant's firm when they were in fact modified by a clerk employed by Debtor's counsel certainly casts a false light on the financial information, and could mislead a creditor into relying upon the accuracy of that information. While CTG's point in this regard is legitimate, the bankruptcy judge adequately addressed the problem during the confirmation hearings.

In *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1216 (9th Cir.1994), the Ninth Circuit considered an argument that disclosure had been inadequate. The BAP had concluded that "those matters appear to have been addressed and resolved through the confirmation process." *Id.* at 1217. The court criticized the BAP's decision because it did not clearly explain how the claims of inadequate disclosure had in fact been resolved by the bankruptcy court during the confirmation process. *Id.* at 1217–18. However, the court did not reject, but instead impliedly endorsed the notion that problems with a disclosure statement can be properly addressed during confirmation. *Id.* at 1218 (remanding to the BAP for "a fuller statement of its reasons for rejecting [the creditor's] claim that disclosure was inadequate.").

Whether information contained in a disclosure statement is properly attributed is an important consideration in the confirmation process. *See, e.g., In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr.

E.D.Tex.1996). While including false information is a more serious matter than a mere lack of information, *see In re Zenith Elecs. Corp.*, 241 B.R. 92, 99–100 (Bankr. D.Del.1999), "the determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court." *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir.1988).

Here, counsel made the bankruptcy court aware during the confirmation hearings of the misleading cover page concerning the financial projections. In response to CTG's objection, the bankruptcy judge considered the declaration of Debtor's accountant, in which the accountant stated that the modifications to the accountant's report made by the clerk and included in the Disclosure Statement were appropriate, and that he would have made the same changes had he not been out of town at the time. Based on this declaration, the bankruptcy judge decided that while the inclusion of the cover page was inappropriate, the Disclosure Statement was not so misleading as to have tainted the voting process. Appellant's E.R. at 1279–80 ("So even though the disclosure statement did include misleading information, [and it was] questioned whether or not the information was so misleading or so material as to have tainted the voting process, I make the finding that it [was] not.").

CTG also argues that Debtor's submission of the new projections during the confirmation hearings but after the completion of the voting process renders the Disclosure Statement misleading in violation of § 1125. Apparently, CTG believes Debtor is attempting to have the best of both worlds by suggesting he would have high income in the Disclosure Statement to entice creditors to vote for the Plan, and then reducing those projections later to show that a new value contribution is nec-

essary to his successful reorganization. *See* Part E, *infra.*

A debtor's projected future income is relevant both when a disclosure statement is approved and at confirmation. *See In re Michelson,* 141 B.R. 715, 718 (Bankr. E.D.Cal.1992). "When the adequacy of information is initially determined during the presolicitation phase, the court is acting in a context in which information may be sketchy and preliminary. The court does not conduct an independent investigation and relies upon its reading of the document for apparent completeness and intelligibility . . . ." *Id.* at 719. Later, at confirmation, "[w]hat once appeared to be adequate information may have become plainly so inadequate and misleading as to cast doubt on the viability of the acceptance of the plan and to necessitate starting over." *Id.* This framework emphasizes increasing the level of disclosure in order to achieve confirmation. *Id.* at 719–20. The use of amended disclosure statements and revised financial projections is not an uncommon part of this process. *See, e.g., In re Hoff,* 54 B.R. 746, 748–52 (Bankr. D.N.D.1985) (addressing an amended disclosure statement and revised financial data submitted at confirmation, and finding the plan complied with § 1129(a)(2)).

Debtor's submission of the new projections was done, at least in part, to satisfy the concerns raised by CTG and the bankruptcy court at the initial confirmation hearing. These new figures were supposedly based upon more recent and accurate information Debtor had obtained regarding his employment. In one sense, it is CTG that is attempting to have it both ways: CTG urges confirmation should be denied because the original projections are unrealistically high, while at the same time suggesting Debtor should be prevented from submitting revised, lower and more accurate figures because doing so would impact CTG's position concerning compli-

ance with the new value exception. Apart from this posturing, the Code required Debtor to prove compliance with § 1129, which in turn required Debtor to provide adequate and accurate information about his financial future.

Obviously, the use of misleading or false information in a disclosure statement may be so serious as to invalidate the voting by creditors as to a plan, requiring a new round of voting after necessary corrections to the disclosure statement are made. Here, the bankruptcy court had the declaration of Debtor's accountant, which provided an adequate basis for the judge's decision that any defects in the Disclosure Statement did not taint the confirmation process. In addition, the bankruptcy judge could have properly concluded that submission of the new projections was beneficial and useful to creditors and the court, providing better and more accurate information.

To be clear, if the bankruptcy judge felt some remedy was appropriate, or if she had been concerned that some manipulation of the confirmation process had occurred, she would have been justified in crafting some solution for dealing with the problem, such as requiring reballoting. Ultimately, however, the record contains sufficient evidence to support the bankruptcy court's conclusion that Debtor's Plan satisfied § 1125. Therefore, the court's factual findings were not clearly erroneous.

**E. May individual debtors use the new value exception to the absolute priority rule embodied in § 1129(b)(2) to "cram down" a plan over the objection of unsecured creditors, and if so, was the new value exception satisfied in this case?**

Under § 1129(a)(8), for a plan to be confirmed, each class of claims or

interests must either be unimpaired by the plan, or it must accept the treatment proposed by the plan. However, a plan may be confirmed even where § 1129(a)(8) is not met if the treatment provided for creditors is "fair and equitable." 11 U.S.C. § 1129(b)(1). A plan is "fair and equitable" if:

> With respect to a class of unsecured claims—
>
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B). This provision, dubbed the "absolute priority rule," generally requires that all unsecured creditors be paid in full before equity security holders are allowed to retain any ownership interest in the debtor. *See Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 654 (9th Cir.1997); *Bonner Mall P'ship v. U.S. Bancorp Mortgage Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 906–07 (9th Cir.1993). There is an exception to this rule, or perhaps a corollary to it, *see Bonner Mall*, 2 F.3d at 906–07, known as the "new value exception." The new value exception to the absolute priority rule allows junior interest holders (*e.g.* shareholders of a corporate debtor) to receive a distribution of property under a plan if they offer "value" to the reorganized debtor that is: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received. *Id.* at 909.

CTG argues the bankruptcy court committed error in concluding the Plan complied with § 1129(b)(1) and (b)(2)(B) because, according to CTG, the new value exception to the absolute priority rule is simply inapplicable in cases filed by individual debtors under Chapter 11. It contends that the new value exception and, indeed, Chapter 11, were designed to accommodate businesses, not individuals.

Without doubt, though, individual debtors are eligible to petition for Chapter 11 relief. *See* 11 U.S.C. § 109(d) (prescribing that a person eligible for Chapter 7 relief is also eligible for Chapter 11 relief); § 109(b) (allowing, with limited exceptions not relevant here, any "person" to be a debtor under Chapter 7); § 101(41) (defining the term "person" to include individuals). In *Toibb v. Radloff*, 501 U.S. 157, 160–61, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991), the Supreme Court held that the Code allows individual debtors not engaged in business to seek relief under Chapter 11. And while not expressly provided in the Code, the Ninth Circuit has construed § 1129(b) so as to incorporate the new value exception. *Bonner Mall*, 2 F.3d at 908–09. Viewed in light of these decisions, CTG's argument must be that individual debtors who file for Chapter 11 relief are not entitled to the same statutory protections and opportunities as other eligible debtors utilizing the provisions of § 1129(b) in seeking confirmation of a plan.

Notwithstanding the provisions of the Code and the case law, the Panel need not resolve whether the new value exception to the absolute priority rule applies in all Chapter 11 cases filed by individual debtors. This is so because, in this case, the bankruptcy court did not make the requisite factual findings that Debtor had satisfied the "substantial" or "necessary" requirements of *Bonner Mall*. Without an

adequate basis to review whether Debtor satisfied the new value exception, it is unnecessary to decide if Debtor could invoke the exception. The deficiency in the court's findings regarding the *Bonner Mall* elements is apparent from a close examination of the role of the new value exception in this case.

Application of the new value exception is relevant in this case because the unsecured class of creditors under the Plan neither accepted the Plan nor are those creditors' claims paid in full. *See* § 1129(b)(2)(B)(i). At the same time, Debtor, whose ownership interests are junior to those of unsecured creditors, is retaining both exempt and nonexempt property under the Plan. *See* 11 U.S.C. § 1129(b)(2)(B)(ii). Debtor is contributing $27,000 from an exempt retirement fund, as well as his future wages, to fund the payments required under the Plan. However, the Supreme Court's decision in *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 204, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), holds that a debtor's future contributions from his labor may not be considered in any new value analysis. *See also Ambanc,* 115 F.3d at 654–55 (examining a partner's "upfront" contribution to a plan). Thus, the *Bonner Mall* test must be met, if at all, based solely on Debtor's contribution to the Plan of exempt pension funds. CTG does not dispute that Debtor's contribution is new or that it is money. CTG does contend, though, that the bankruptcy court erred in finding Debtor's contribution was substantial, necessary for a successful reorganization, and that it was reasonably equivalent to the interest Debtor would receive under the Plan.

As to whether the contribution was substantial, CTG contends it is inappropriate to consider the entire $27,000 offered by Debtor. Instead, CTG suggests any calculations made should use either $4,000, the amount needed to pay administrative expenses, or $19,379, the amount needed to cover administrative expenses and make up the shortfall in Debtor's budget over the first two years of the Plan. CTG also argues that in analyzing Debtor's contribution, the bankruptcy court should have compared the contribution to the unsecured claim amounts set forth in the Disclosure Statement, totaling $519,645, rather than those in Debtor's schedules, totaling $432,662.

In cases involving corporate debtors, a new value contribution will presumably always have some use, whether it be for operating capital, financing for capital improvements or purchases, or to establish and maintain cash reserves, for example. But, in the case of an individual Chapter 11 debtor who works for wages or a salary, a new value contribution in excess of that necessary to fund payments under the plan serves no reorganization purpose absent some identifiable use, other than to arguably manipulate the new value analysis.

Such is the case here. It is unclear from the Plan and Disclosure Statement how Debtor will utilize the contribution of exempt funds beyond the payment of administrative claims, which should total about $4,000. However, relying upon the new projections, $19,379 would be required to both pay administrative claims and make up budget shortfalls during the initial years of the Plan. Even so, Debtor's contribution of an additional $7,621 to the Plan adds nothing of value to creditors, particularly when Debtor has no business to reorganize, and no use for the remaining balance is specified. Thus, while Debtor offers to contribute $27,000, in this case, $19,379 is the proper figure to use in measuring whether Debtor's new value contribution satisfies the exception to the absolute priority rule.

The Ninth Circuit in *Ambanc* declined to specifically adopt a particular methodology for determining whether a contribution was substantial, holding instead that a "*de minimis* contribution" did not satisfy the new value exception. 115 F.3d at 655. The court did note that several different considerations may be relevant in the analysis, including comparing the amount of the contribution to total unsecured claims, comparing the contribution to the amount of claims being discharged, and considering the extent of the dividend being paid on unsecured claims by virtue of the contribution. *Id.*

Here, because of the dispute over what should be considered the amount of Debtor's unsecured claims, Debtor's contribution is equivalent to either 3.7% or 4.4% of total unsecured claims. The bankruptcy court apparently decided that, whatever the extent of the unsecured claims, the amount to be contributed by Debtor was substantial. However, the bankruptcy court made no specific factual findings related to this issue on the record, nor did it engage in any helpful explanation as to how or why it reached this conclusion. Absent adequate findings of fact to support the court's decision, this conclusion amounts to an abuse of discretion.

The same is true with respect to another important element of the new value exception. Under the *Bonner Mall* test, the debtor's proposed contribution of new value must also be necessary for an effective reorganization. The bankruptcy court failed to make any findings to support its conclusion that this element of the test had been satisfied. For example, the bankruptcy court did not find that without the contribution from Debtor's pension plan, the plan could not succeed. In fact, it

appears from the record that the bulk of the proposed cash contribution will not be needed to fund the plan. Absent adequate findings of fact, it was an abuse of discretion for the bankruptcy court to conclude that the proposed contribution was necessary to an effective reorganization in this case.

**F. Did the bankruptcy court correctly find that Debtor's Plan was proposed in good faith under § 1129(a)(3)?**

CTG contends that Debtor did not prove the Plan was proposed in good faith as required by § 1129(a)(3).[9] According to CTG, Debtor filed the bankruptcy case solely to obtain protection against CTG's collection efforts pending his appeal of the district court judgment and to obviate the need to post an appeal bond. In support of this argument, CTG points out that Debtor has no business to reorganize and that his other debt is so small that reorganization is unnecessary.

In general terms, a bankruptcy court must consider the totality of the circumstances of a particular case in assessing the debtor's good faith. *In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074–75 (9th Cir.2002); *Stolrow's*, 84 B.R. at 172. In *Sylmar*, the Ninth Circuit rejected the use of *per se* rules in determining whether good faith exists, and upheld a finding of good faith where the debtor invoked a provision of the Code preventing a creditor from receiving a higher default interest rate under a loan agreement. *Id.* at 1074–76. The court in *Sylmar* concluded that the debtor's filing for bankruptcy relief was consistent with the objectives and purposes of the Code, even though the

---

**9.** "The court shall confirm a plan only if all of the following requirements are met: ... [t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

case dealt primarily with a single creditor. *Id.*

In contrast to *Sylmar,* other Ninth Circuit authority holds that good faith is lacking where a debtor accesses Chapter 11 solely as a litigation tactic. *In re Marsch,* 36 F.3d at 829. In *Marsch,* the debtor filed a bankruptcy petition before a state court could enter a restitution order. *Id.* at 827. The debtor's purpose in filing was to stay the state court action pending an appeal and to avoid having to post an appeal bond. The court explained that even assuming a Chapter 11 petition could be filed for this purpose with the ultimate goal of preventing a business disruption, the debtor was an individual wage-earner who could not make such an argument. *Id.* at 829. Additionally, the court noted that the debtor had the means to pay the judgment. *Id.* The *Marsch* court also noted that the bankruptcy court made specific findings regarding the debtor's bad faith motivation in seeking relief under the Code. *Id.* at 827–29.

Here, the bankruptcy court did not make any detailed findings concerning Debtor's good faith. The fact that Debtor filed his bankruptcy petition not long after a sizable money judgment was entered against him by the district court, and the fact that Debtor appealed that judgment, suggest a *Marsch*-type analysis may be appropriate. Further, just as in *Marsch,* Debtor has no business that will be disrupted, and there is some evidence he may have the means to satisfy the judgment, or at least to pay for an appeal bond.

Because of the factual similarity of this case to *Marsch,* and because CTG objected to confirmation on good faith grounds, the bankruptcy court's cursory finding that "the requirements for ... confirmation have been satisfied under § 1129" is insufficient. Appellant's E.R. at 1419–20. It is unclear from the record what facts the bankruptcy court relied upon in concluding Debtor's Plan was proposed in good faith. Should the bankruptcy court consider confirmation of another plan in this case, it should clarify the factual basis for its conclusion that Debtor's Plan was proposed in good faith.

## CONCLUSION

The decision of the bankruptcy court to confirm the Plan must be reversed. The bankruptcy court clearly erred in deciding that Debtor's Plan provided CTG the same treatment as other unsecured creditors in Class 5 as required by § 1123(a)(4). Debtor stipulated, and the bankruptcy court ordered, that CTG's claim be deemed allowed for purposes of the Chapter 11 case. Proposing significantly different payment terms for CTG's claim was not the same treatment offered other allowed unsecured creditors.

The bankruptcy court's interpretation of § 1141(d)(2) as potentially allowing the plan to include a collection injunction was correct. However, the bankruptcy court failed to adequately set forth its factual findings as to whether the collection injunction in this case was properly restricted in scope and duration, why the collection injunction was necessary for Debtor's reorganization, or whether any hardships to be imposed on CTG as a result of imposition of the injunction were outweighed by any benefits enjoyed by the Debtor.

The bankruptcy court's decision that the disclosure statement was not so misleading as to require that confirmation be denied was not clear error.

Even assuming the new value exception to the absolute priority rule applies in Chapter 11 cases filed by individual debtors, the bankruptcy court failed to make adequate factual findings that any contri-

bution by this Debtor to the Plan was either substantial or necessary. Therefore, the court's conclusion that the Plan satisfied the *Bonner Mall* elements for the new value exception to the absolute priority rule under § 1129(b) was an abuse of discretion.

Finally, the bankruptcy court failed to adequately set forth the facts upon which it relied in deciding that the Plan was proposed in good faith.

For these reasons, the decision of the bankruptcy court is REVERSED and the case is REMANDED to the bankruptcy court for further proceedings consistent with this decision.