NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY APPELLATE PANEL

OF THE NINTH CIRCUIT

In re:                          )   BAP No.   NV-13-1179-JuKiTa
                                )
ALFRED J.R. VILLALOBOS,         )   Bk. Nos.  10-52248
et al.                          )             10-52249
                                )             10-52251
            Debtors.            )             10-52252
_____)   (jointly administered)
                                )
UNITED STATES OF AMERICA,       )
                                )
            Appellant,          )
                                )
v.                              )   M E M O R A N D U M*
                                )
ALFRED J.R. VILLALOBOS;         )
ARVCO CAPITAL RESEARCH, LLC;    )
ARVCO FINANCIAL VENTURES, LLC;  )
ARVCO ART, INC.                 )
                                )
            Appellees.          )
_____)

Argued and Submitted on January 24, 2014
at Las Vegas, Nevada

Filed - March 10, 2014

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Gregg W. Zive, Bankruptcy Judge, Presiding
_____

Appearances:    Virginia Cronan Lowe, Esq., U.S. Department of
                Justice, argued for appellant, United States of
                America; Stephen R. Harris, Esq., Harris &
                Petroni, LTD, argued for appellees, Alfred J.R.
                Villalobos, Arvco Capital Research, LLC, Arvco
                Financial Ventures, LLC, and Arvco Art, Inc.
_____

     * This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8013-1.

-1-

Before:  JURY, KIRSCHER, and TAYLOR, Bankruptcy Judges.

Alfred J.R. Villalobos (Villalobos) filed a chapter 11[1] petition on behalf of himself and Arvco Capital Research, LLC (ACR), Arvco Financial Ventures, LLC (AFV), and Arvco Art, Inc. (ART) (collectively, Debtors).  Subsequently, over the objections of the United States of America, on behalf of its agency, the Internal Revenue Service (IRS), the bankruptcy court confirmed the jointly administered[2] Debtors' liquidation plan and directed Debtors to prepare detailed findings of fact and conclusions of law (FFCL) and submit an order confirming the plan.

Over nine months later, Debtors lodged the FFCL and transmitted a modified plan to interested parties.  Due to the modifications in the plan and renewed objections by IRS and others, the bankruptcy court held a second confirmation hearing and entered an order confirming the Corrected and Revised First Amended Jointly Administered Debtors' Plan of Liquidation, as Amended (Plan).  IRS appeals from this order.

On appeal, IRS alleges that the bankruptcy court erred in finding that the Plan complied with § 1129(a)(9)(C), (11), and (15).  We agree.  Accordingly, we REVERSE the order confirming the Plan on these grounds and REMAND for further proceedings in

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.  "LR" references are to the Bankruptcy Local Rules for the District of Nevada.

[2] The plan was proposed by the jointly administered Debtors. The plan provided for substantive consolidation of the estates.

accord with this memorandum.

## I.  FACTS

**A.  Debtors' Business And Events Leading to Bankruptcy**

Villalobos was an investment banker for the last thirty years.  He was the managing member and held a ninety-nine percent equity interest in ACR and AFV (collectively, ARVCO).  Villalobos operated ARVCO as a placement agent that solicited investments by public pension funds in private equity funds.

In May 2010, the State of California filed a civil law enforcement action in Los Angeles County Superior Court against Villalobos, ACR, and Federico Buenrostro, alleging a fraudulent scheme to obtain placement agent commissions by corrupting the investment decision-making process of the California Public Employees' Retirement System ("CalPERS") (State Court Action).  After the filing, the State of California Attorney General's office (AG) sought and obtained a temporary restraining order from the superior court, freezing all assets under Villalobos' control (including all bank accounts, real property, vehicles, and art work) and placing them in the custody of a receiver.  The asset freeze extended to ACR business accounts, Villalobos' personal accounts, AFV's employee benefit accounts, educational trusts set up for Villalobos' grandchildren, and the artwork of ART.[3]  On May 28, 2010, the superior court entered a permanent injunction and confirmed the receiver's appointment.

---

[3] ART is a Nevada corporation and is 100% owned by Villalobos.  Villalobos serves as president and director.  ART is a holding company for various works of art.

**B.    Bankruptcy Proceedings**

A few weeks later, on June 9, 2010, Villalobos filed a chapter 11 petition for himself, ACR, AFV and ART.[4]  On the same day, Debtors sought an order under § 543(b) directing the receiver to turn over Debtors' property under his control.  By stipulation, the receiver turned over to Debtors all of their assets and property within his custody.

Villalobos' schedules showed real and personal property valued at $63 million.  In amended Schedule B, Villalobos listed, among other personal property assets, causes of action against CalPERS valued at $10 million.[5]  Villalobos scheduled liabilities of approximately $14 million, of which $7.2 million was secured against six of his real properties, and $6.5 million was in unsecured non-priority claims.

In its amended proof of claim filed on October 24, 2011, IRS asserted an unsecured priority tax claim against Villalobos for $2,654,572.22 and an unsecured general tax claim for $112,392.77.

**1.    IRS' Motions To Dismiss Or Convert**

In January 2011, IRS filed its first motion to dismiss or convert Debtors' cases, alleging there was a substantial or continuing loss to or diminution of the estates and the absence of a reasonable likelihood of rehabilitation, gross mismanagement of the estates, and failure to timely file

---

[4] In July 2010, the bankruptcy court entered an order for the joint administration of all four debtors.

[5] This asset was also listed in AFV's and ACR's Schedule B.

-4-

required reports.  The parties eventually stipulated to time frames in which IRS could update its motion and Villalobos and others could respond.  The stipulation in effect restarted the pleading process relative to the initial motion to convert.

In May 2011, IRS renewed and supplemented its motion to dismiss or convert (Amended Motion).  After a hearing, the bankruptcy court entered an order on June 22, 2011, denying IRS' initial motion and Amended Motion to dismiss or convert without prejudice.  In the June 22, 2011 order, the court also (1) directed Debtors to file a plan and disclosure statement by September 2, 2011; (2) set a disclosure statement hearing for September 30, 2011; (3) directed counsel for the unsecured creditors' committee (Committee) to hold all proceeds from the sale of nonexempt assets; and (4) limited Villalobos' expenditures to $10,000 per month for personal expenditures and $10,000 per month for business expenditures, both commencing June 1, 2011.[6]  The bankruptcy court continued IRS' motions to dismiss or convert to the same time as the confirmation hearing.

**2.  The Liquidation Plan**

Pursuant to the bankruptcy court's June 22, 2011 order, Debtors filed a chapter 11 plan and a supporting disclosure

---

[6] Earlier the bankruptcy court had approved an Order, Nunc Pro Tunc, Approving Payment of Ordinary Course Expenses, which allowed Villalobos proposed expenditures of $128,052 per month. IRS appealed that order to this court, which reversed and remanded the matter because the bankruptcy court had failed to provide findings of fact and conclusions of law to support Villalobos' budget under any test.  See United States v. Villalobos, et al. (In re Villalobos), 2011 WL 4485793 (9th Cir. BAP 2011).

statement on September 2, 2011. Since then, Debtors filed numerous amendments to their disclosure statement and plan. We do not mention them all in this appeal.

On October 6, 2011, Debtors filed a First Amended Jointly Administered Debtors' Disclosure Statement. The next day, Debtors filed an Amended Chapter 11 Plan. Debtors' plan was a five-year plan of liquidation. To pay secured and unsecured creditors, Debtors proposed to collect over $9 million dollars in accounts receivable held by ACR and to sell various nonexempt real and personal property (Available Assets). Debtors also proposed to devote fifty percent of the net proceeds after collection fees and costs, if any, of Debtors' claim against CalPERS, which Villalobos valued at $10 million to the payment of unsecured creditors. The plan, however, allowed Villalobos to retain the remaining fifty percent of such proceeds as well as certain exempt assets and did not require him to contribute disposable income to the plan. Debtors would implement the plan by creating a liquidating trust that would be administered by a liquidating trustee and a subsequent transfer of the Available Assets into the trust. Numerous parties, including IRS, filed objections to this version of the disclosure statement and plan.

To address the objections, on October 21, 2011, Debtors filed a Second Amended Jointly Administered Debtors' Disclosure Statement and Amended Chapter 11 Plan.

On November 15, 2011, the bankruptcy court approved the Second Amended Jointly Administered Debtors' Disclosure Statement. One day later, Debtors filed an amendment to their disclosure statement and plan.

On November 17, 2011, Debtors noticed a confirmation hearing scheduled for December 29, 2011. The plan documents that were noticed for solicitation, balloting, and objections consisted of the plan and disclosure statement filed on October 21, 2011 and the amendment to the plan and related amendment to the disclosure statement filed on November 16, 2011. A copy of the liquidating trust was not included with the plan or the solicitation package.

IRS, the State of California and the Office of the United States Trustee objected to the confirmation of this version of the plan. IRS complained that although the plan referenced a liquidating trust, there was no document provided concerning the operation and duration of the trust. IRS further argued that the plan violated numerous subsections of § 1129.

Debtors filed the proposed liquidating trust agreement one week prior to the confirmation hearing.

On December 29 and 30, 2011, the bankruptcy court held the confirmation hearing. A number of objections to the plan were addressed; some were addressed by a further amendment to the plan filed just prior to the second day of the hearing. Other objections were to be resolved by further modifications to the plan, and other objections (certain objections made by the IRS) were overruled.

During the December 29, 2011 hearing, the bankruptcy court allowed oral modifications to the plan in connection with IRS' objection under § 1129(a)(9)(C). The court also did not allow the plan to state that § 1115 was "deemed satisfied" when Villalobos had not committed his future income. At the end of

-7-

the hearing, the bankruptcy court stated that it found no liquidation analysis or evidence on the feasibility of the plan. The court continued the hearing until the next day so that Debtors could address these issues.

At the end of the second day, the bankruptcy court set forth its FFCL on the record and found that the requirements for confirmation under § 1129 were met. Based on a declaration submitted by Jeffrey Hartman, counsel for the Committee and the proposed liquidating trustee, the bankruptcy court found the plan met the requirements under § 1129(a)(9)(C) and (11). The court overruled IRS' remaining objections and directed Debtors to jointly prepare detailed FFCL consistent with the oral findings and conclusions placed on the record and to submit an order confirming the plan in accordance with LR 9021.

**3.    The Delay In Entry of the FFCL and Order Confirming The Plan**

Pursuant to LR 9021, Debtors were required to prepare proposed FFCL and an order and transmit the documents to all counsel for approval or disapproval as to form. Under the rule, Debtors were required to file the proposed documents with the court (lodged) within twenty-eight days after the hearing that concluded on December 30, 2011. See LR 9021(a)(4). If the proposed documents were not lodged with the court within thirty-five days, "the motion or other matter will be deemed withdrawn," unless otherwise ordered. LR 9021(a)(5).

Debtors did not lodge the proposed FFCL with the bankruptcy court until October 12, 2012. The FFCL that were lodged stated

that Debtors' estates would be substantively consolidated[7] and that the substantively consolidated estates' assets and liabilities would be combined and transferred into the liquidating trust on or before the Effective Date of the Plan. The FFCL also set forth several provisions to implement the substantive consolidation.

In addition, the FFCL addressed payment for IRS' unsecured priority claim. The liquidating trust would disburse quarterly payments of $25,000 to IRS commencing ninety days following the Effective Date and continuing each quarter until March 9, 2015. On June 9, 2015, Debtors proposed to pay IRS' prepetition priority tax claim in full from the assets available in the liquidating trust. If assets were not available in the liquidating trust for payment, IRS would receive payment from Villalobos' fifty percent net recovery from litigation against CalPERS. In the event of default, IRS could pursue Villalobos, but not the liquidating trust, for payment as authorized under the Internal Revenue Code. The payment of the quarterly $25,000 was conditioned on existing allowable administrative claimants consenting to the payment. All administrative claimants had consented with the exception of the state court receiver and his professionals.

On the same day that they lodged the FFCL, Debtors transmitted a Revised First Amended Jointly Administered Debtors' Plan of Liquidation and the liquidating trust agreement

---

[7] The original plan also had called for substantive consolidation. That provision of the plan was never materially challenged nor discussed at the confirmation hearing.

-9-

to counsel. Debtors did not lodge the proposed plan confirmation documents with the bankruptcy court until October 18, 2012.

Pursuant to LR 9021(b)(2)(A), IRS filed its statement of objection to the proposed FFCL. In addition to its objections, and as an alternative to the proposed documents, IRS requested the bankruptcy court to simply enter an order that confirmation of the plan was deemed withdrawn pursuant to LR 9021(a)(5). Under LR 9021(b)(2)(A), Debtors had five business days from October 18, 2012, to file responses to the statements of objections filed by IRS and AG. Debtors did not file a response until six weeks later on November 29, 2012.

Due to Debtors' failure to comply with LR 9021 and lodge the FFCL and a proposed confirmation order with the bankruptcy court, IRS filed a third motion to dismiss or convert Debtors' cases on September 20, 2012. In addition to the grounds asserted in IRS' earlier motions, which were incorporated by reference, the third motion cited Debtors' inability to confirm their chapter 11 plan and the passage of nine months since the December 2011 confirmation hearing.

To address the LR 9021 matters, the bankruptcy court set a status hearing for December 4, 2012, the same time as a continued hearing on IRS' renewed motion to dismiss or convert. At the December 4, 2012 hearing, the bankruptcy court noted that revised documents had been sent to the court just minutes before the hearing and that the confirmation documents submitted were markedly different from what was discussed at the hearings conducted on December 29 and 30, 2011. After a lengthy

-10-

discussion, the bankruptcy court ordered Debtors to file their proposed confirmation documents with the court and notice a hearing. The court opined that it was relatively satisfied that Debtors did not have to re-solicit votes because the proposed amendments did not adversely affect any other creditor.

IRS was given until January 4, 2013, to file a new statement of objections to the filed documents. In effect, the court thereby initiated a new LR 9021 procedure.

On December 5, 2012, Debtors filed their Corrected and Revised First Amended Jointly Administered Debtors' Plan of Liquidation (Redlined) and their proposed FFCL in support of Order Confirming Corrected and Revised First Amended Jointly Administered Debtors' Plan of Liquidation. Thereafter, IRS filed its statement of objections to the December 5, 2012 confirmation documents, along with a supporting declaration. Among other things, IRS objected to the procedure whereby Debtors used the LR 9021 procedures to effect a modification of their original plan rather than complying with the provisions of the Bankruptcy Code. Additionally, without waiving its objection as to procedure, the IRS set forth objections to the recently revised plan and proposed FFCL. Subsequently, Debtors responded, agreeing to some of the IRS' objections.

On February 4, 2013, Debtors filed another Corrected and Revised First Amended Jointly Administered Debtors' Plan of Liquidation.

Meanwhile, on March 14, 2013, an indictment was unsealed in a criminal case pending in the United States District Court for the Northern District of California (Case No. CR 013-169)

-11-

against Villalobos. The indictment charges Villalobos with multiple charges, among other things, that Villalobos created false investor disclosure letters involving CalPERS and lied to federal authorities during their investigations.[8]

On March 19, 2013, the bankruptcy court held a hearing to consider the LR 9021 pleadings and IRS' renewed motion to dismiss or convert. The court directed certain changes be made and then ruled, again, that the plan would be confirmed and that IRS' renewed motion to dismiss or convert would be denied, as mooted by confirmation of the plan.

Three days later, Debtors filed the Plan at issue in this appeal apparently to make certain modifications discussed at the March 19, 2013 hearing. On April 1, 2013, the bankruptcy court entered the FFCL in support of the order confirming the Plan and the corresponding order. IRS filed a timely notice of appeal.[9]

Thereafter, IRS filed motions for a stay pending appeal, in the bankruptcy court and this court, which were denied.

## C.   Implementation of the Plan

On the Effective Date, May 1, 2013, Debtors' estates were substantively consolidated and the substantively consolidated assets and liabilities were combined and transferred into the liquidating trust. As a result, the liquidating trustee, Mr. Hartman, assumed the management of all the property to be liquidated under the Plan and commenced distributions.

---

[8] This recent development directly impacted a valuation analysis of the litigation between Villalobos and CalPERS.

[9] On April 15, 2013, IRS filed an amended notice of appeal. It is unclear why an amendment was needed.

## II.  JURISDICTION

Because the Plan has been confirmed, distributions commenced, properties sold, and there is no stay pending appeal of the confirmation order, the question arises whether this appeal is moot and subject to dismissal.  We must dismiss if constitutionally moot, Drummond v. Urban (In re Urban), 375 B.R. 882, 887 (9th Cir. BAP 2007), and we may dismiss if equitably moot.  Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC), 391 B.R. 25, 33–35 (9th Cir. BAP 2008).  For the reasons below, we conclude that this appeal is not constitutionally moot and, in the exercise of our discretion, we do not dismiss this appeal as equitably moot because we can grant IRS effective relief on some of its claims without unraveling the steps taken in reliance on the confirmed Plan.  To the extent Debtors' counsel asserted at oral argument that this appeal may be characterized as "anticipatorily moot", we reject that contention.

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(L).  We have jurisdiction under 28 U.S.C. § 158.

## III.  ISSUES

A.    Whether IRS' appeal of the confirmation order is moot; and

B.    Whether the bankruptcy court abused its discretion in confirming the Plan.

## IV.  STANDARDS OF REVIEW

While we review a bankruptcy court's decision to confirm a chapter 11 plan for an abuse of discretion, its determination that the plan satisfies the confirmation requirements

-13-

necessarily requires the bankruptcy court to make factual findings, which are reviewed under a clear error standard. Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1358 (9th Cir. 1986); Computer Task Group, Inc. v. Brotby (In re Brotby), 303 B.R. 177, 184 (9th Cir. BAP 2003). Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake has been committed. In re Brotby, 303 B.R. at 184.

In applying an abuse of discretion test, we first "determine de novo whether the [bankruptcy] court identified the correct legal rule to apply to the relief requested." United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). If the bankruptcy court identified the correct legal rule, we then determine whether its "application of the correct legal standard [to the facts] was (1) illogical, (2)implausible, or (3) without support in inferences that may be drawn from the facts in the record." Id. If the bankruptcy court did not identify the correct legal rule, or its application of the correct legal standard to the facts was illogical, implausible, or without support in inferences that may be drawn from the facts in the record, then the bankruptcy court has abused its discretion. Id.

**V. DISCUSSION**

**A. Mootness**

We have an independent obligation to consider mootness sua sponte, Felton Pilate v. Burrell (In re Burrell), 415 F.3d 994, 997 (9th Cir. 2005), because we lack jurisdiction, Urban, 375 B.R. at 887, or it may be the case that any remedy may be

-14-

unjust given the change in position of third parties, <u>Clear Channel</u>, 391 B.R. at 33-35. "The test for mootness of an appeal is whether the appellate court can give the appellant any effective relief in the event that it decides the matter on the merits in his favor. If it can grant such relief, the matter is not moot." <u>In re Burrell</u>, 415 F.3d at 998. We conclude that this appeal is not constitutionally moot.

The equitable mootness question requires careful analysis due to the Ninth Circuit's "comprehensive test" for determining whether an appeal is equitably moot. This analysis requires consideration of: (1) whether a stay was sought; (2) whether substantial consummation of the Plan has occurred; (3) the effect a remedy may have on third parties not before the court; and (4) whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court. <u>Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)</u>, 677 F.3d 869, 881 (9th Cir. 2012). Here, the circumstances are that of a chapter 11 liquidation and, therefore, we must apply the above factors with that liquidation context in mind. Furthermore, IRS appeals only certain aspects of the confirmation order. Consequently, we consider whether we can fashion effective and equitable relief with respect to each of IRS' claims.

With respect to the first factor, IRS diligently sought a stay pending appeal from the bankruptcy court and this court, both of which were denied. IRS' failure to obtain a stay is not dispositive. <u>Id.</u> Considering the second factor, the Available

-15-

Assets have been transferred to the liquidating trust for disposition and distributions have commenced to IRS and others in compliance with the Plan,[10] rendering the Plan substantially consummated.  See § 1102(2).

Because the Plan has been substantially consummated, we conclude that equitable mootness forecloses IRS' challenges to the procedural deficiencies in connection with confirmation of the Plan.  Specifically, IRS contends that the bankruptcy court erred by not enforcing the formal requirements for plan modification under § 1127 in violation of § 1129(a)(2).  In support, IRS raises a number of points, most notably that sixteen months passed between the time the plan and disclosure statement were noticed to creditors for disclosure, balloting, and objections, the noticed plan did not contain a copy of the liquidating trust and the modifications made to the plan after the notice were material.[11]  IRS does not say which modifications it considers material.  Nonetheless, we conclude that reversal of the confirmation order on this point would have an adverse effect on the Plan and third parties who are not before us. Placing the parties back to square one would require the

_____

[10] Shortly after confirmation, IRS received payments for the four quarters of 2012 and first two quarters of 2013.

[11] We are not convinced by Debtors' argument that IRS did not preserve this issue for appeal.  IRS raised the issue in its objection to confirmation of First Amended Jointly Administered Debtors' Plan of Liquidation, As Amended.  In addition, the bankruptcy court and IRS' counsel discussed the issue at the December 30, 2011 confirmation hearing.  IRS also raised the issue in many of its other pleadings.  Thus, the issue was sufficiently raised and preserved for appeal.

-16-

complete unraveling of the Plan and create an uncontrollable situation for the bankruptcy court. We thus conclude that it would be inequitable to upset the Plan on this ground. We reach the same conclusion with respect to IRS' contention that Debtors' failure to timely file monthly operating reports is grounds for reversal of the confirmation order under § 1129(a)(2). Accordingly, we do not address the merits of IRS' appeal on § 1129(a)(2) grounds.

However, despite substantial consummation of the Plan, we conclude that it would not be inequitable to consider IRS' remaining claims under § 1129(a)(9), (11) and (15). Even if this court adopted IRS' positions under each subsection, the liquidation of Debtors' assets would not have to be modified and any distributions previously made to creditors would not be reduced. Further, § 1127(e) states that "[i]f the debtor is an individual, the plan may be modified at any time after confirmation . . . before completion of payments under the plan, whether or not the plan has been substantially consummated . . . ." Moreover, requiring Villalobos to contribute disposable income in the future is contemplated by the Plan under Article VIII, ¶ 3H. Finally, on remand, if there is sufficient evidence to show that the Plan is feasible and that Debtors can meet their obligation to pay IRS' priority tax claim within the five year period under § 1129(a)(9)(C), the Plan would survive intact. Accordingly, we address the merits of IRS' challenges to the confirmation order under § 1129(a)(9), (11) and (15).

-17-

### 1. Anticipatory Mootness

At oral argument, Debtors' counsel asserted in general terms that this appeal may possibly become moot in the future if the Plan is reversed and the cases subsequently converted to chapter 7. Presumably, the argument goes that because the assets have vested in the liquidating trust and there is no longer a chapter 11 estate, a subsequent conversion would not vest trust property in the chapter 7 estate.[12] Consequently, any decision by us might make this appeal moot because the chapter 7 trustee would not have authority to liquidate the assets that are now held in trust. However, what affect a Plan reversal will have is only speculative. As it stands, effective relief is still available. Accordingly, we need not "dismiss a live controversy as moot merely because it may become moot in the near future." Hunt v. Imperial Merchant Servs., Inc., 560 F.3d 1137 (9th Cir. 2009) (declining to dismiss a case that might be considered "anticipatorily moot" under the doctrine of prudential mootness); see also Campbell v. Wood, 18 F.3d 662, 680 (9th Cir. 1994) ("Mootness is caused by an act, not by the apprehension of a potential act.").

Moreover, application of controlling Ninth Circuit law to these facts leads us to conclude that conversion of the chapter 11 cases would revest the assets held by the liquidating trust in the chapter 7 estate. We look at "two plan components

---

[12] There is no question that § 1141(b) — which states that upon confirmation of a plan, all property of the estate revests in the debtor — does not apply in this case. Here, the Plan plainly provides that title to the non-exempt assets would vest in the liquidating trust.

to determine whether an asset revests in a chapter 7 estate post-conversion:  an explicit provision regarding the distribution of future proceeds of an asset to creditors, and the retention of broad powers in the bankruptcy court to oversee implementation of the plan." Captain Blythers, Inc. v. Thompson (In re Captain Blythers, Inc.), 311 B.R. 530, 539 (9th Cir. BAP 2004) (citing Pioneer Liquidating Corp. v. U.S. Trustee (In re Consol. Pioneer Mortg. Entities), 264 F.3d 803, 807 (9th Cir. 2001)).

Here, neither the Plan nor the Liquidating Trust Agreement say anything about what happens to the assets in the liquidating trust upon conversion to chapter 7.  However, the Plan contains explicit provisions regarding distribution of the liquidation proceeds to Debtors' creditors.  The Plan states that Debtors' non-exempt assets, claims and liabilities were to be transferred to a liquidating trust and that the liquidating trustee would administer those assets through the operative trust agreement for the benefit of Debtors' creditors.  See Plan at p. 2:19-24. The Plan further provides that it will be executed and implemented through the transfer to the liquidating trust of all of "Debtors' assets . . . in an amount sufficient to pay [ ] Debtors' allowed secured and unsecured creditors' claims over the life of the Liquidating Trust . . . ." See Plan, Art. VIII, ¶ 1 at pp. 36-37.  Finally, the Plan states that the liquidating trustee "shall be responsible for making the payments contemplated in the Liquidation Plan, collecting money intended for distribution to claimants, and transmitting it to them." See Plan, Art. IX, ¶ 1 at p. 45.  Collectively, the only

-19-

plausible inference from these provisions is that the non-administered assets which remained in the liquidating trust would revert to the chapter 7 estate so that they could be liquidated and the proceeds distributed to creditors consistent with Debtors' intent under the Plan.

This result would also follow from the termination of the liquidating trust. Although the Liquidating Trust Agreement does not have a termination clause, in Article II, ¶ 3, the agreement states that the liquidating trust's "sole purpose is to hold, liquidate, and distribute the Trust Assets in accordance with the provisions of the Plan." If Debtors' cases were converted, the trust would terminate since the purpose of the trust would become an impossibility. At this point, the liquidating trustee would be compelled under § 542 to turn over the remaining assets to the chapter 7 trustee.

Finally, Article XII of the Plan gives the bankruptcy court broad powers to oversee the implementation of the Plan. The bankruptcy court retained jurisdiction to determine the allowability and payment of any claims, to determine disputes over administration of the liquidating trust, and to facilitate consummation of the Plan by entering any further necessary or appropriate orders. See Plan, Article XII, ¶ 1,2,&3 at pp. 47-48. These provisions easily satisfy the second Consolidated Pioneer prong.

Thus, even if we reverse confirmation of the Plan and the cases converted, the unadministered assets held by the liquidating trust for the benefit of Debtors' creditors would become assets of the estate upon conversion to chapter 7. As

-20-

this appeal is not moot with respect to § 1129(a)(9), (11) and (15), we now turn to the merits.

**B.    The Merits**

Debtors had the burden of proving all the elements governing plan confirmation.  Leavitt v. Soto (In re Leavitt), 209 B.R. 935, 940 (9th Cir. BAP 1997), aff'd, 171 F.3d 1219 (9th Cir. 1999).  The requirements for plan confirmation are listed in § 1129(a) (stating that the court shall confirm a plan only if all the following requirements have been met).[13]

**1.    Whether the Plan Complies With § 1129(a)(7)(A)**

Section 1129(a)(7)(A)[14] requires that the present value of distribution under the plan, which must account for the time

---

[13] If the only condition not satisfied is the eighth requirement, § 1129(a)(8), the plan must satisfy the "cramdown" alternative to this condition found in § 1129(b).  Cramdown requires that the plan "does not discriminate unfairly" against and "is fair and equitable" towards each impaired class that has not accepted the Plan.  Here, all voting impaired classes accepted the plan, including the general unsecured creditors in Class 5A.  Thus, the bankruptcy court concluded that the provisions of § 1129(b) were not at issue.  Later, however, the bankruptcy court issued a finding that the Plan was fair and equitable under § 1129(b) "in case it was necessary."  The cramdown provisions are not implicated in this appeal.

[14] This section states:

With respect to each impaired class of claims or interests—
(A)    each holder of a claim or interest of such class—
        (i) has accepted the plan; or
        (ii) will receive or retain under the plan on
        account of such claim or interest property of
        a value, as of the effective date of the
        plan, that is not less than the amount that
        such holder would so receive or retain if the
        debtor were liquidated under chapter 7 of
        this title on such date.

-21-

value of money, be no less than a dividend upon liquidation in a chapter 7. The bankruptcy court's determination of the creditors' best interests under § 1129(a)(7)(A) is a finding of fact reviewed under the clearly erroneous standard. See Farmers Home Admin. v. Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648, 653 (9th Cir. BAP 1994).

IRS contends that the bankruptcy court erred in finding that the Plan satisfied the best interest of creditors test under § 1129(a)(7)(A) because it improperly allows Villalobos to retain property of the estate which would be available in a chapter 7 case. In this regard, IRS asserts that Villalobos' use of estate funds while IRS successfully appealed the nunc pro tunc order which allowed Villalobos expenditures of $128,052 per month could be recovered by a chapter 7 trustee under § 549. IRS provides no authority in support of this position.

Next, IRS asserts that assets borrowed or withdrawn from Villalobos' defined benefit plan and/or what is called the Voluntary Employee Benefits Association (VEBA) plan would become property of Villalobos' bankruptcy estate as after-acquired property under § 1115. Therefore, according to IRS, those assets would also be available to a chapter 7 trustee if the case was converted. IRS points out that under the confirmed Plan, Villalobos was allowed to retain those assets. Again, IRS cites no case law to support its position.

In its reply brief, IRS takes a different approach, arguing that additional assets have been discovered which would be deemed property of the estate under chapter 7, but which are excluded from the Plan because it designates only "Available

-22-

Assets" for liquidation. According to the IRS, the U.S. Trustee has filed an adversary proceeding against Villalobos alleging that he had failed to disclose numerous jewelry items and an agreement to enter into a paid consultation position with an entity named VCT.

In the end, we conclude that IRS' various arguments offer little if any analysis to assist the court in evaluating its legal challenge to confirmation of the Plan on § 1129(a)(7)(A) grounds. It is IRS' burden on appeal to present the court with legal arguments to support its claims. Indep. Towers of Wash. v. Washington, 350 F.3d 925, 929 (9th Cir. 2003) ("Our circuit has repeatedly admonished that we cannot manufacture arguments [for a party] . . . . Rather, we review only issues which are argued specifically and distinctly . . . ."). If an argument is not properly argued and explained, the argument is waived. Id. at 929-30 (holding that a party's argument was waived because "[i]nstead of making legal arguments," the party simply made a "bold assertion" of error, with "little if any analysis to assist the court in evaluating its legal challenge"); Hibbs v. Dep't of Human Res., 273 F.3d 844, 873 n. 34 (9th Cir. 2001) (finding that an assertion of error was "too undeveloped to be capable of assessment" and thus waived). Moreover, we have no practical reason to attempt to analyze IRS' undeveloped arguments when reversal on § 1129(a)(7)(A) grounds would provide only superfluous relief due to our reversal of confirmation on other grounds.

**2. Whether the Plan Complied With § 1129(a)(9)(A)**

Section 1129(a)(9)(A) requires that a plan provide that

-23-

administrative claims will be paid in full, in cash on the effective date of the plan. The exception is when "the holder of a particular claim has agreed to a different treatment of such claims." Here, the Plan provides that:

> With respect to the allowed administrative claimants and the Code requirement that they be paid on or before the Effective Date unless they consent to some type of alternative treatment, all allowed administrative claimants have agreed to be paid on a pro rata basis as funds become available from the Liquidating Trust, except the Allowed Administrative Claims of the Receiver and his professionals, and that they will not insist on payment in full as of the Effective Date of the Liquidation Plan.

IRS contends that the Plan does not comply with § 1129(a)(9)(A) because it incorrectly provides that administrative claims will be paid, not on the effective date of the Plan, but "as funds become available from the Liquidating Trust." IRS asserts that while certain specific holders of administrative claims did agree to that treatment, the Plan inaccurately defers payment of all administrative claims. IRS further maintains that it did not consent to deferred payment and the identity of all administrative claim holders was not yet known since the bar date for filing administrative claims was set after confirmation.[15]

A reorganization plan resembles a consent decree and, therefore, should be construed basically as a contract. <u>Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n</u>, 997 F.2d 581, 588 (9th Cir. 1993). Under Nevada law, when the parties do not

---

[15] At the time it raised this objection, the IRS stated it did not know whether it had an administrative claim. As noted below, it did not file one.

dispute the facts, the interpretation of a contract is a question of law. <u>Washoe Cnty. v. Transcontinental Ins.</u>, 878 P.2d 306, 307-08 (Nev. 1994). We disagree with IRS' interpretation of the language in the Plan. The language employed does not explicitly take away any administrative claimant's right to payment in full absent consent. Rather, the Plan states that the only administrative claimants which did not consent to deferred payment were the state court receiver and his attorneys and those claimants were paid in full upon confirmation by the liquidating trustee as required under § 1129(a)(9)(A). While there may have been some outstanding administrative claims, no other creditor, including the IRS, filed an administrative claim post-confirmation by the June 10, 2013 administrative claims bar date. Claimants who did not file their claims by the administrative claims bar date are not administrative claimants with allowed claims entitled to payment in full on the Effective Date. Accordingly, we conclude that the Plan's alleged failure to comply with § 1129(a)(9)(A) is not a basis for reversal.

**3.  Whether the Plan Complied With § 1129(a)(9)(C) and (11)**

Debtors' obligation to pay IRS' priority tax claim in installments over a period ending not later than five years after the date of the order for relief under § 1129(a)(9)(C) is related to the feasibility requirement under § 1129(a)(11). Under § 1129(a)(9)(C) and (11), Debtors must prove that they are likely to meet their obligations under the Plan, including their priority tax obligations. Generally, the feasibility test under

-25-

§ 1129(a)(11) requires only that the debtor demonstrate that the plan has a reasonable probability of success. <u>Beal Bank USA v. Windmill Durango Office, LLC (In re Windmill Durango Office, LLC)</u>, 481 B.R. 51, 67 (9th Cir. BAP 2012). "[Feasibility] is a finding of fact, which [a court] may not disturb on appeal unless it is clearly erroneous." <u>In re Gavia</u>, 24 B.R. 573, 574 (9th Cir. BAP 1982).

Debtors proposed a plan of liquidation which is permissible under § 1129(a)(11). According to the Plan, Debtors will pay the IRS' priority tax claim by making $25,000 quarterly payments from the liquidating trust with a balloon payment on June 9, 2015. If there are insufficient funds in the liquidating trust on June 9, 2015, to make the balloon payment, as a back-up, Villalobos will contribute his fifty percent net recovery in the CalPERS litigation. IRS complains that there was no evidence to show Debtors will be able to pay IRS' unsecured priority claim in full within the five-year period prescribed by § 1129(a)(9)(C). We agree.

At the December 29, 2011 confirmation hearing, Debtors presented no evidence on feasibility. The bankruptcy court noted that the plan was to be funded by the conveyance of assets to the liquidating trust and "there's no evidence that there are sufficient value to those assets to pay the unsecured creditors." The court further noted that the value of the tangible assets going to the trust, based on sales already approved, were not anything close to the values listed on Debtors' schedules. With respect to the various causes of action to be pursued by the liquidating trust, the bankruptcy

-26-

court stated that those potential assets "are certainly not subject to quantification at this time." In response, Committee counsel, Mr. Hartman, stated that "it would be a shot in the dark to attempt to ascribe value."

Nonetheless, the next day, Mr. Hartman submitted a declaration which estimated a high liquidation value of the Available Assets, including the litigation, at $24,888,500 and a low value at $11,185,000. Taking Mr. Hartman's declaration at face value, the bankruptcy court estimated that the liquidation value of the assets would be around $14 million, excluding proceeds from CalPERS litigation and the recovery of the accounts receivable. The court next estimated that perhaps $5.5 million would be recovered with respect to the accounts receivable. That would, in the bankruptcy court's view, amount to $19 million which would be enough to pay creditors in full, "notwithstanding the CalPERS litigation." Then, on top of that, the bankruptcy court considered Villalobos' contribution of his fifty percent recovery from the CalPERS litigation as additional "back-up" to make payment to IRS. On this basis, the bankruptcy court found that the Plan was feasible under § 1129(a)(11) and complied with § 1129(a)(9)(C).

While a relatively low threshold of proof will satisfy § 1129(a)(11), there was no competent evidence in the record to show that Debtors would be able to meet their obligations under the Plan, including their priority tax obligations. Mr. Hartman did not testify at the confirmation hearings in December 2011 or at the March 19, 2013 hearing as to how he arrived at the liquidation values nor did he provide evidence to support them.

In his declaration, Mr. Hartman stated that the "real property values are difficult to anticipate." With respect to the personal property, Mr. Hartman declared that the "[e]stimated recovery for other assets necessarily requires some amount of speculation and in some cases will require litigation for recovery."

There were no appraisals attached to his declaration showing the value of the real properties to be sold nor was there evidence of comparable sales. Thus, it is impossible to tell whether the real property could be sold at Hartman's estimated high value, the low value or somewhere in between. Further, personal property included avoidance actions valued at between $600,000 and $450,000, but nowhere is there an analysis regarding that litigation. Nonetheless, the bankruptcy court placed a value of $14 million on the assets, excluding the accounts receivable and CalPERS litigation.

In addition, at least $7.3 million of the low liquidation value was ascribed to collection of accounts receivable, but nowhere was there information about the collectability of the accounts receivable when those accounts were implicated in the State Court Action.[16] As noted by the U.S. Trustee at the December 30, 2011 confirmation hearing, "[i]f nothing gets

_____

[16] In fact, the record reflects that collecting two major accounts, Apollo Management and Aurora Resurgence Capital, is problematic and intertwined with the State Court Action. Unless Debtors prevail in that litigation, which no one attempts to predict, these accounts are likely uncollectible. Therefore, to the extent the bankruptcy court relied on collection of these accounts in its feasibility analysis, such reliance was unfounded.

-28-

collected from those, this plan is not feasible." Nonetheless, the bankruptcy court estimated $5.5 million would be recovered.

Moreover, Mr. Hartman ascribed a high value of $5 million to Debtors' litigation against CalPERS and a low value of 0. However, he never provided an analysis of the litigation nor did he discuss the probabilities of Villalobos' success in light of the criminal case against Villalobos. Yet, the bankruptcy court accepted Villalobos' contribution of his fifty percent recovery from the CalPERS litigation as a "back-up" for payment to IRS.[17] Finally, Mr. Hartman provided no information regarding the timing for the sales or any information on when the litigation against CalPERS would end.

In sum, the bankruptcy court's account of the evidence on feasibility and whether Debtors' could pay the IRS' unsecured priority claim within the five year period under § 1129(a)(9)(C) was not plausible in light of the record viewed in its entirety. We thus conclude that the bankruptcy court clearly erred by finding that the Plan met the requirements under § 1129(a)(9)(C) and (11).

**4. Whether the Plan Complied With § 1129(a)(15)(B)**

The Plan provides in Article VIII, ¶ 3H:

> Villalobos is entitled to retain his post-confirmation disposable income and any after acquired property through the duration of the Liquidation Plan, although Villalobos must disclose his post confirmation disposable income and after acquired property in a written report to be filed with the Court every six

[17] Debtors further asserted that performance under the Plan was assured because in default the IRS could collect directly from Villalobos and his exempt assets. A default provision is not performance under the Plan and cannot support feasibility.

-29-

(6) months after the Confirmation Date. Further, during the duration of the Liquidation Plan (i.e. five (5) years from the Effective Date), any creditor . . . may move to modify the Plan pursuant to § 1127 to request that after acquired property or post confirmation disposable income may be used to implement and consummate the Debtors' Liquidation Plan.

Section 1129(a)(15) sets forth the burden of proof an individual debtor must meet to obtain confirmation of a plan when an allowed unsecured claim objects to confirmation. Because IRS is the holder of an allowed unsecured claim[18] which has objected to the confirmation of the Plan, § 1129(a)(15)(A) requires Villalobos to pay all creditors in full[19] or comply with subsection (B) which states:

[T]he value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

The statute refers us to § 1325(b)(2), which defines disposable income as current monthly income (CMI) received by the debtor less amounts reasonably necessary to be expended for the maintenance or support of the debtor or dependent of the debtor. § 1325(b)(2)(A)(i). CMI for purposes of calculating disposable income is defined under § 101(10A) as the average monthly income from all sources that the debtor receives over

_____

[18] IRS' unsecured claim is in the amount of $112,392.77.

[19] While Debtors suggest that creditors may be paid in full from the liquidation of Available Assets, they also acknowledge that due to the uncertainty of the pending litigation, there is also a potential likelihood that unsecured claims will not be paid in full.

-30-

the six-month period[20] preceding the filing of the schedule of current income required by § 521(a).  (Emphasis added).  Exceptions are then made for three categories of income: (1) benefits received under the Social Security Act; (2) payments made to victims of war crimes or crimes against humanity; and (3) payments made to victims of terrorism.  See § 101(10A).

At the December 29, 2011 confirmation hearing, the bankruptcy court found, without analysis or citation to evidence, that Villalobos did not have disposable income.  At one point, referring to the disposable income requirement, the bankruptcy court stated: "I'm told that there is none.  Well, I don't know how Mr. Villalobos is going to live for the next five years . . . ."  On December 30, 2011, at the continued confirmation hearing, the bankruptcy court stated again "[h]e has no disposable income at this time."  However, nowhere in the record do we find evidence of Villalobos' CMI nor do we find amounts that were reasonably necessary for the maintenance or support of Villalobos and his dependents.  Factual determinations such as whether a debtor has disposable income are clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been committed.  In re Brotby, 303 B.R. at 184.  Here, we are left with such an impression.

Debtors maintain that it is undisputed that Villalobos had

---

[20] Due to the sixth month period, the fact Villalobos reported $100 million in gross income for the period from 1990 through 2008 is irrelevant.

-31-

no postpetition income or earnings from services. However, the record shows that there has been postpetition income from exempt sources. As Debtors acknowledge, the calculation of a debtor's projected disposable income must take into account any changes in the debtor's financial circumstances that are reasonably certain to occur during the term of the plan. See Ransom v. FIA Card Servs., N.A., __ U.S. __, 131 S.Ct. 716, 725 (2011); Hamilton v. Lanning, 560 U.S. 505, 130 S.Ct. 2464, 2478 (2010).

Although Villalobos lost his earnings from his businesses as an investment banker due to the State Court Action, in amended declarations filed in lieu of monthly operating reports prior to the March 19, 2013 hearing on confirmation of the modified plan, Villalobos disclosed his postpetition income and expenses for the time period December 2011 through January 2013. The declarations show Villalobos paid his living and other expenses[21] with income from exempt sources - social security, proceeds from retirement funds and distributions from his defined benefit plan. While the definition of CMI does not include benefits from social security, Drummond v. Welsh (In re Welsh), 711 F.3d 1120 (9th Cir. 2013), the pension income and proceeds from retirement funds received by Villalobos must necessarily fall within the ambit of the definition of CMI which includes income received by a debtor "from all sources." "All" can only be taken to mean "all," exempt income or not. See Diamond Z Trailer, Inc. v. JZ L.L.C. (In re JZ L.L.C.), 371 B.R.

---

[21] In total, the amended declarations show that the amount spent was over $500,000 for this time period. Therefore, it can hardly be said that Villalobos does not have postpetition income.

-32-

412, 422-23 (9th Cir. BAP 2007) ("All means all."); <u>Moen v. Hull (In re Hull)</u>, 251 B.R. 726, 732 (9th Cir. BAP 2000) (exempt income is included when determining projected disposable income).[22]

In short, Villalobos' amended declarations show that he had CMI from which reasonable amounts could be deducted in order to calculate disposable income. Villalobos, as a proponent of the plan, bore the burden of showing that the confirmation requirements under § 1129(a)(15) were met. This he did not do. Shifting the burden to a creditor to file a motion to modify, as the Plan provides, does not satisfy this mandate of the Code. Accordingly, the bankruptcy court erred in finding that the requirements under § 1129(a)(15) had been met.

**VI.  CONCLUSION**

For these reasons, the Plan does not comply with § 1129(a)(9)(C), (11) and (15). We therefore REVERSE the confirmation order on these grounds and REMAND for proceedings in accord with this memorandum.

---

[22] In connection with its argument under § 1129(a)(15), IRS also mentions that the Plan runs afoul of § 1115. Section 1115 defines property of the estate for individual chapter 11 debtors which includes, among other things, after acquired property and earnings from services performed by the debtor after the commencement of the case. However, whether property is property of Villalobos' estate has no impact on the disposable income analysis because projected disposable income is not confined to "property of the estate." <u>See</u> <u>In re Hull</u>, 251 B.R. at 732.