**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**
**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No. SC-17-1273-LSKu |
| ) | |
| CHRISTOPHER JOHN HAMILTON and ) | Bk. No. 3:14-bk-3142-C-11 |
| ELIZABETH LEIGH TESOLIN, ) | |
| ) | |
| Debtors. ) | |
| _____ ) | |
| ) | |
| ELITE OF LOS ANGELES, INC.; ) | |
| SAN DIEGO TESTING SERVICES, ) | |
| INC., ) | |
| ) | |
| Appellants, ) | |
| ) | |
| v. ) | **M E M O R A N D U M***  |
| ) | |
| CHRISTOPHER JOHN HAMILTON; ) | |
| ELIZABETH LEIGH TESOLIN, ) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

Argued and Submitted on May 24, 2018
at Pasadena, California

Filed - July 31, 2018

Appeal from the United States Bankruptcy Court
for the Southern District of California

Honorable Christopher B. Latham, Bankruptcy Judge, Presiding
_____

Appearances:    Gerald N. Sims of Pyle Sims Duncan & Stevenson
                argued for Appellants; Paul John Leeds of Higgs
                Fletcher & Mack LLP argued for Appellees.
                _____

---

    *This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8024-1.

Before: LAFFERTY, SPRAKER, and KURTZ, Bankruptcy Judges.

Appellants Elite of Los Angeles, Inc. ("Elite") and San Diego Testing Services, Inc. ("SDTS") (collectively, "Appellants") appeal the bankruptcy court's order confirming Debtors' Sixth Amended Combined Plan of Reorganization and Disclosure Statement dated March 21, 2017 (the "Plan"). Appellants argue that the bankruptcy court erred in finding that all confirmation requirements were met and in approving a Plan provision that enjoined them from enforcing their nondischargeable claims against Debtors for the term of the Plan.

We REVERSE.

**FACTS**

**A.    Events Giving Rise to the Debt to Appellants**

Elite provided academic counseling, tutoring, and college preparatory and standardized test prep services to high school students.  In 1999, Mr. Hamilton joined Elite as a faculty member.  In 2006, Elite formed a sister company, SDTS, and Mr. Hamilton became a shareholder, officer, and director of SDTS.

After a few years, Mr. Hamilton grew discontent with Elite. In 2011, he retained a law firm to advise him on separating from Elite and forming his own company.  Thereafter, while still an officer and director of SDTS, Mr. Hamilton formed Summa Consulting, LLC ("Summa"), an academic counseling and tutoring company.  He also began gathering Elite's proprietary information with the assistance of other SDTS employees and his wife, Ms. Tesolin.  He took employee personnel files, student records, teaching materials and lesson plans, curriculum development tools, and a copy of the data on SDTS's server.  He also began

-2-

undermining SDTS's prospective business by discouraging potential students from enrolling at SDTS and diverting them to Summa's programs.

On October 6, 2011, without any prior notice, Mr. Hamilton resigned from SDTS. That same day, he used Elite's confidential contact list to send emails notifying SDTS's clients of his departure and soliciting business for Summa. Over the next two weeks, several other employees left SDTS to join Mr. Hamilton at Summa, leaving only one employee remaining at SDTS.

Shortly thereafter, Appellants filed suit in state court against the Debtors, Summa, and other former SDTS employees, asserting causes of action for breach of fiduciary duty, breach of the duty of loyalty, intentional interference with prospective economic advantage, trade secret misappropriation, unfair competition, aiding and abetting, violation of California Penal Code § 502, and unjust enrichment. Following a trial, the jury returned two special verdicts in Appellants' favor. In relevant part, it found Mr. Hamilton liable for $2,070,000 for breach of fiduciary duty, breach of the duty of loyalty, intentional interference with prospective economic advantage, trade secret misappropriation, and punitive damages. It also found Ms. Tesolin jointly and severally liable for $1,855,000 under an aiding and abetting theory ("Elite Judgment").

The state court also entered judgment against Summa for $1,000,000. Thereafter, Summa was recapitalized by new investors in exchange for a majority stake of the company; Mr. Hamilton's ownership interest was reduced to thirteen percent. The new majority owners required Mr. Hamilton to sign an employment

-3-

agreement with Summa that included covenants against competing with Summa. A few weeks later, in February 2014, the new owners terminated Mr. Hamilton's employment with Summa. Mr. Hamilton sued Summa and its owners in state court for damages and declaratory relief related to Summa's termination of Mr. Hamilton's employment.[1]

On April 24, 2014, the day of a scheduled sheriff's sale of Mr. Hamilton's stock in SDTS, Debtors filed a chapter 11[2] petition. Appellants filed proofs of claim based on the debt arising from the Elite Judgment. Appellants also filed an adversary proceeding seeking to except the Elite Judgment from discharge under § 523(a)(6). After a trial in the adversary proceeding, the bankruptcy court entered a judgment finding the $2,070,000 Elite Judgment nondischargeable in its entirety as to Mr. Hamilton and $160,000 of the Elite Judgment nondischargeable as to Ms. Tesolin. The bankruptcy court also awarded Appellants postjudgment interest at varying rates for different time periods.[3]

---

[1]That action was removed to the bankruptcy court, and the parties settled the litigation in the spring of 2017.

[2]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[3]This Panel affirmed the nondischargeability determination by memorandum decision issued April 17, 2018 (BAP Nos. SC-17-1126-FBL and SC-17-1223-FBL). In the same decision, the Panel reversed and remanded on the issue of the appropriate rate for postjudgment interest, holding that Appellants were entitled to

(continued...)

**B.    Mr. Hamilton's Employment With HCC**

Shortly after the bankruptcy petition was filed, Mr. Hamilton became employed by Crystal Vision Enterprises, LLC, dba Hamilton College Consulting ("HCC"), an entity formed in April 2014.  HCC's sole member is Mr. Hamilton's mother, Diana Hamilton.  HCC offers college test preparation, admissions counseling, and private tutoring.  Mr. Hamilton has no ownership interest in HCC but is its president as well as its Head of Faculty and Curriculum.  He is paid an annual salary of $199,000.  Mr. Hamilton's employment agreement with HCC provides that HCC will indemnify Mr. Hamilton for expenses, including attorneys' fees and costs, incurred by Mr. Hamilton in the bankruptcy case and related adversary proceedings ("Indemnity Agreement").  HCC's Operating Agreement also contains a provision indemnifying Mr. Hamilton for the Elite Judgment itself.

**C.    Debtors' Plan of Reorganization**

Over the course of the bankruptcy, Debtors filed several plans, drawing objections from Appellants and Summa.[4]  In March 2017 Debtors filed the Plan.  The Plan contains the following relevant provisions:

- The Plan is to be funded from (i) a portion of Mr. Hamilton's salary at HCC (totaling $90,000 over the

---

[3](...continued) postjudgment interest at the state rate (ten percent) for the entire postjudgment period.  Both dispositions were appealed to the Ninth Circuit Court of Appeals (18-60026 and 18-60027), where they currently remain pending.

[4]Pursuant to the settlement of the Summa litigation in May 2017, Summa withdrew its objections to confirmation.

Plan term); (ii) $60,000 in settlement proceeds from the Summa litigation; and (iii) approximately $57,000 generated from Mr. Hamilton's SDTS stock (dividends or proceeds) over the 60-month Plan term.

- Appellants' claims are partially secured by Debtors' equity in their rental property in Pasadena, California (Class 1E). Specifically, the Plan treats $298,881.06 of those claims as secured, to be paid over 360 months with interest at 6 percent, for a total payout of $644,943.47. The Plan treats the balance of Appellants' claims, approximately $1.9 million, as unsecured.

- Total general unsecured claims are estimated at $2.3 million, including Appellants' claims. General unsecured creditors, including Appellants, will receive between 6.5 and 9 percent of their allowed claims over the Plan term, depending on the amount of funds generated from the STDS stock.

- For administrative claims, the estate will contribute $30,000 and HCC will contribute, on the effective date, $200,000 toward Debtors' attorneys' fees totaling $580,000, with the balance to be paid by a secured promissory note from HCC to be delivered on the effective date. The remaining administrative claims will be paid on the effective date.

- Enforcement of nondischargeable claims against property committed to the Plan is enjoined during the Plan period so long as Debtors are not in material default

under the Plan.[5]

- Debtors will retain their equity interest in the Pasadena property. According to the Plan, this provision does not violate the absolute priority rule because HCC is providing new value by contributing $200,000 on the effective date.

- The payments of professional fees by HCC may be deductible by HCC as a business expense, but if not, they are deductible by Debtors. In any event, HCC is required under the employment contract to increase Mr. Hamilton's compensation to cover any income tax liability arising from disallowance of such a deduction.

- According to the liquidation analysis, general unsecured creditors would receive nothing in a chapter 7 liquidation;[6]

In its Order Denying Confirmation of the Fifth Amended Combined Plan and Disclosure Statement, the bankruptcy court had found that the proposed collection injunction would be

_____

[5]After confirmation and within the appeal period, Debtors filed a motion to correct the confirmation order, arguing that the provision permitting collection against income or property not committed to fund the Plan was "hopelessly ambiguous." The bankruptcy court construed the motion as one under Civil Rule 59(e), applicable via Rule 9023, and denied the motion as unjustified. Debtors did not cross-appeal this ruling.

[6]According to the liquidation analysis, estimated net proceeds from real and personal property and avoidance of preferential or fraudulent transfers would be approximately $130,000; after deducting estimated chapter 7 administrative expenses ($40,000) and chapter 11 professional fees ($580,000), there would be nothing left over for any other creditors.

-7-

permissible so long as (i) its duration was limited to the plan period; (ii) the injunction would not apply to any income or property not being used to fund the plan; (iii) it would end upon a material default under the plan; and (iv) any creditor could move to modify or dissolve the injunction for cause. The Plan so provided.

Appellants filed an objection to confirmation of the Plan, arguing that (i) the Plan was not proposed in good faith; (ii) the Plan was illusory as it did not provide for payment of nondischargeable claims at the end of the enforcement stay; (iii) the Plan was not feasible; (iv) the Plan was not fair and equitable; (v) the cramdown requirements were not satisfied; (vi) the Plan violated the absolute priority rule, and HCC's contributions did not constitute new value. Appellants also argued that Debtors' disclosures were inadequate. Appellants voted against confirmation; all other creditors voted in favor of confirmation.

After the initial confirmation hearing held May 17, 2017, the bankruptcy court issued an interim order finding in relevant part that (i) additional discovery as to whether HCC was Mr. Hamilton's alter ego was unnecessary as that relationship was not an impediment to plan confirmation; and (ii) HCC's effective date contribution satisfied the new value corollary to the absolute priority rule. The court, however, requested additional briefing on whether HCC's payment of Debtors' personal legal bills and other expenses would be a taxable event for the estate.

The parties submitted additional briefing on the tax issue, and the court held a second confirmation hearing on July 21,

2017. At that hearing, the bankruptcy court found that the indemnification payments from HCC would not result in additional tax liability for Debtors, and that even if HCC could not deduct those payments, it had sufficient revenues to satisfy the resulting tax liability. Accordingly, the court overruled all of Appellants' objections and confirmed the Plan.

Appellants timely appealed.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(L). We have jurisdiction under 28 U.S.C. § 158.

**ISSUE**

Whether the bankruptcy court abused its discretion in confirming Debtors' Plan.

**STANDARDS OF REVIEW**

We review the bankruptcy court's decision to confirm a plan of reorganization for abuse of discretion. Computer Task Group, Inc., v. Brotby (In re Brotby), 303 B.R. 177, 184 (9th Cir. BAP 2003). To determine whether the bankruptcy court has abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court identified the correct legal rule to apply to the relief requested and (2) if it did, whether the bankruptcy court's application of the legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. United States v. Hinkson, 585 F.3d 1247, 1262-63 & n.21 (9th Cir. 2009) (en banc).

A determination that a plan meets confirmation standards requires the bankruptcy court to make factual findings and

interpret the law. In re Brotby, 303 B.R. at 184. Factual determinations regarding good faith and feasibility are reviewed for clear error, id., as is a determination that a plan is in the best interest of creditors, United States v. Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648, 653 (9th Cir. BAP 1994), aff'd, 85 F.3d 1415 (9th Cir. 1996), and is fair and equitable. See Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1358 (9th Cir. 1986).

We review de novo the bankruptcy court's interpretation of the Bankruptcy Code, including its construction of § 1129(b) allowing individual debtors to utilize the new value exception to the absolute priority rule. In re Brotby, 303 B.R. at 184.

**DISCUSSION**

To this Panel, the most challenging aspect of the Plan is the collection injunction, which the bankruptcy court approved despite the fact that the Plan makes no provision for any meaningful payment of Appellants' claims. As will be discussed, we hold that the bankruptcy court erred in approving that injunction. With or without the collection injunction, the Plan is not feasible. And given that the Plan delays payment of Appellants' claims without any definite proposal to pay them, it essentially neuters Appellants' rights to be paid, and thus does not meet the good faith requirement. Finally, the bankruptcy court did not make sufficient findings to support its conclusion that the $200,000 contribution by HCC met the new value exception to the absolute priority rule.

**A. The bankruptcy court erred in approving the collection injunction where the Plan did not make a feasible proposal to pay Appellants' nondischargeable claims in full.**

Paragraph 7 of the Plan provides that any creditors holding nondischargeable claims are

> specifically enjoined from enforcing such claims during the Plan period, so long as Debtors are not in material default under the Plan. The injunction described in this section is limited to the Plan period. It does not apply to any income or property not being used to fund the Plan. If there is a material default under the Plan, the injunction described in this section will terminate. At any time, any creditor may move to modify and/or dissolve the injunction for cause.

The bankruptcy court approved this provision over Appellants' objections. In doing so, the court extensively analyzed the relevant authorities, concluding – correctly – that a collection injunction is not per se prohibited under the Code (see discussion, below). The bankruptcy court then applied the standard for injunctive relief set forth in this Panel's decision in Brotby (discussed below), and concluded that the proposed injunction was permissible. Specifically, the court found that Debtors had shown that the injunction was necessary for a successful reorganization because, without it, Appellants could collect against income and property being used to fund the Plan, and the Plan would fail. The bankruptcy court also found that the circumstances weighed in favor of the injunction, so long as Appellants were not prohibited from pursuing income or property not being used to fund the Plan. We conclude, however, that the bankruptcy court erred in approving the collection injunction because the Plan provided for no meaningful distribution to Appellants' nondischargeable claims. In fact, due to the accrual of interest, the net effect of the Plan is to increase the amount

-11-

of those claims during the Plan term.[7] In the cases relied upon by the bankruptcy court, the plans at issue provided for full payment of such claims. Lacking either such a provision, or an analysis that would have provided doctrinal support for the proposition that a plan might not merely delay payment, but might make payment materially less certain, the Plan here cannot satisfy the test for injunctive relief set forth in those cases.

Section 1141(d)(2) provides that "[a] discharge under this chapter does not discharge a debtor who is an individual from any debt excepted from discharge under section 523 of this title." Thus, a chapter 11 plan may not discharge a nondischargeable claim. The Code, however, does not prohibit payment of such a claim through a plan. See In re Mercado, 124 B.R. 799, 801-02 (Bankr. C.D. Cal. 1991) (noting that § 1141(d)(2) preserves the right of a creditor holding a nondischargeable claim to full payment but does not provide that the provisions of a confirmed plan cannot affect the rights of that creditor).[8] Moreover, § 1141(d)(2) does not prohibit a plan from placing conditions on the creditor's right to collect such a claim. In re Brotby, 303 B.R. at 189-90. "There is no indication that the statute was intended to prohibit a temporary restriction on the collection activities of creditors holding nondischargeable claims." Id. at

---

[7]At oral argument, Appellants' counsel estimated, and Debtors' counsel did not dispute, that the claims will have grown to over $3 million by the end of the Plan term.

[8]Of course, nothing in the Code **requires** that a plan provide for payment of a non-dischargeable claim – but the failure to account for such a claim would almost certainly lead to a failure to demonstrate feasibility.

-12-

188. And § 105 provides the necessary authority to impose such an injunction in a chapter 11 plan in appropriate circumstances. Id. at 190-91.

As the Brotby Panel observed, interpreting § 1141(d)(2) to permit temporary restrictions on collection of nondischargeable claims in a chapter 11 plan is

> consistent with the bankruptcy policy favoring a fresh start for the debtor, while giving appropriate protection to the rights of creditors. This interpretation encourages flexibility for debtors attempting to reorganize, and may serve as an incentive to pursue confirmation of a plan instead of liquidation. At the same time, creditors, including those holding nondischargeable claims, are protected by the confirmation standards. In practice, as here, nondischargeable claims are paid in full, while other creditors also receive a benefit. An interpretation of § 1141(d)(2) that an individual debtor's plan can in no fashion modify the rights of a creditor holding a claim excepted from discharge would effectively grant that creditor a veto over the reorganization process. If a creditor holding a nondischargeable claim could not be temporarily prevented by a plan from pursuing collection, even where the creditor will be paid in full over time, that creditor is "in a position to undercut a debtor's attempt to reorganize, possibly harming other creditors who might benefit from the proposed plan."

Id. at 189-90 (quoting In re Mercado, 124 B.R. at 803).

The plan at issue in Brotby provided for full payment of a nondischargeable claim, assuming the debtor did not prevail in a pending appeal of the original judgment.[9] In the meantime, the

---

[9]Debtor was to deposit monthly payments into a reserve account. If the creditor prevailed on appeal, it would be entitled to the money paid into the account and any remaining payments over six years, and the debtor would continue to make monthly payments to the creditor for two more years to satisfy the entire amount of the nondischargeable debt. If debtor prevailed in the appeal, the funds in the reserve account would be applied to the unpaid balances owed to general unsecured

(continued...)

-13-

creditor was to be enjoined from any attempts to collect the nondischargeable portion of its claim other than through its receipt of plan payments. The bankruptcy court overruled the creditor's objections and confirmed the plan, including the collection injunction, and the creditor appealed. The Brotby Panel held that although the collection injunction was not per se prohibited by the Code, approval of such a provision must be supported by findings that: (i) the injunction "is necessary to allow the debtor to successfully reorganize and perform the terms of the Chapter 11 plan," 303 B.R. at 190; (ii) the injunction is "tailored in duration and scope to afford the necessary relief to the debtor while not placing unnecessary restrictions on the target creditor's rights," id.; (iii) the injunction is "effective only as long as the debtor is properly performing and complying with the terms of the plan," id.; and (iv) the bankruptcy court has balanced the relative hardships on the debtor and creditor and concluded that the equities favor imposition of the injunction and confirmation of the plan." Id. at 190-91.[10] Because the bankruptcy court had not made the

---

[9](...continued)
creditors. 303 B.R. at 182.

[10]These standards are akin to those applicable when determining whether to grant a preliminary injunction. To obtain a preliminary injunction, the plaintiff must show:

> (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases).

(continued...)

necessary findings to support imposition of the collection injunction, the Panel remanded. Id. at 191. Significantly, the required findings on remand did not include a finding that the nondischargeable claim would be paid in full because that requirement was neither factually nor legally in dispute.

Similarly, the plan at issue in Mercado provided that creditors with nondischargeable claims would be paid in full, while simultaneously enjoining those creditors from executing on any nondischargeable judgment in the absence of a plan default. The Mercado court found that the injunction was not per se inconsistent with § 1141(d)(2) but did not approve the injunction because it found that the debtor had failed to prove that the injunction was necessary for the success of his reorganization. Id. at 805.

In both of these cases, the question was not **whether** the creditor would be paid in full through the plan, but **when**. Full payment was assumed. See In re Brotby, 303 B.R. at 190 ("the debtor must demonstrate that the injunction does not prevent, but merely postpones, the creditor's collection of the nondischargeable claim in full pending debtor's performance of the plan"); In re Mercado, 124 B.R. at 803 ("[c]learly, the

[10](...continued)
Alternatively, a court may grant the injunction if the plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.), 502 F.3d 1086, 1093 (9th Cir. 2007).

-15-

creditor has a right to be paid the full amount of its claim. The plan cannot substitute some other treatment."). In both cases, the bankruptcy courts also found that the injunction could be approved so long as the debtors made the requisite showing that they would pay the nondischargeable claims in full, over time, and that the purpose of the plan injunction was to allow other creditors also to receive material, non-trivial distributions. And in Brotby, we agreed with this reasoning. So the effect of the injunctions in both of those cases was merely to delay, but not to deny or avoid full payment of the nondischargeable claim.

As such, Mercado and Brotby cannot be cited to support the injunction proposed here. The Plan does not merely delay payment on the nondischargeable claims over the entirety of the plan term – it fails to make any provision for the forestalled creditor ever to be paid in full. While the injunction does not prohibit Appellants from executing against assets or income not committed to the Plan, there is no evidence in the record of the value of any such assets or income. And the Plan provides no basis whatsoever for payment of the nondischargeable claims after the completion of the Plan. Rather, at the end of the Plan term, Appellants will be left with the same ability to collect, but from an individual who is five years older and will apparently have no increased ability or additional resources to pay the nondischargeable claims.[11] And it goes without saying that the

[11]Appellants' counsel represented at oral argument that Debtors intend to pay the nondischargeable claim at the end of
(continued...)

debtor's earnings would remain nominally controlled by his mother.

Under these facts, one cannot apply the test for injunctive relief applied in Brotby and Mercado. Because those cases assumed as a factual and legal certainty that the nondischargeable claim was required to be and would be paid, the injunctive relief test did not require an affirmative showing regarding certainty of payment (i.e., "likelihood of success") or a balancing of the respective harms to the debtor and holder of the nondischargeable claim other than impact of the delay of payment to one creditor – the nondischargeable claim holder – against the likelihood that, without the injunction, there would be no distribution to holders of general unsecured claims.

Where a plan merely delays, but does not imperil, the payment of a nondischargeable claim, such a plan may be consistent with the overall bankruptcy purpose of maximizing payments to all creditors. An injunction under such a plan may be analyzed via a simple application of the injunctive relief standards. A court can determine the likelihood of ultimate payment (feasibility), as well as balance relative hardships (balancing mere delay in payment, which can be compensated via interest, versus the opportunity for the debtor to pay other creditors and get a fresh start with respect to dischargeable claims).

---

[11](...continued)
the Plan term, but the Plan makes no such commitment, nor is there evidence in the record that Debtors will have the means to pay the claim in full at that time.

-17-

But here, it is impossible to justify the Plan's collection injunction on those principles, or even to decide how a judge would fairly and competently perform the requisite analysis. The proposed plan imposes a five-year hiatus on collection (without any increased consideration for any uncertainty imposed merely by delay). Moreover, there is no proposal how, let alone assurance that, the debtor – then five years older – is going to pay such a claim. The proposed collection injunction is not merely delaying payment; it is, in a real sense, either avoiding or denying payment to the creditor. Such a plan turns putatively low risk nondischargeable claims into what are the equivalent of discharged claims via delay and enforced forbearance.

Similarly, there is simply no way to "balance the hardships" in such a scenario. Neither Mercado nor Brotby, which each purport to use an injunctive relief standard, even address how such a balancing test might work on these facts. Nor does either case suggest how to reduce to numerical terms the risk of significant delay, which might result in nonpayment, versus the benefit of some payment to other creditors – and indeed, this Panel is at a loss to know how to articulate or apply such a balancing test – doing so would require formulating a legal test not expressed in the applicable case law and, more importantly, factfinding that it would be inappropriate for this Panel to undertake.

The bankruptcy court here misapplied the test for injunctive relief when it essentially ignored the long-term effect of the plan and the vastly increased risk to Appellants: an increase in the amount of the nondischargeable claim with absolutely no

mechanism to pay it in or out of the Plan. Under these circumstances, the purported delay, which is effectively denial of payment, is not outweighed by any benefit to Appellants. In other words, there is no "balancing" of anything – the injunction essentially obliterates the rights of the holders of the nondischargeable claims.

We wish to stress here that we are not today declaring a "per se" rule that any plan that purports to deal with a nondischargeable claim must in every instance provide for the full and certain payment of such a claim. This case simply does not provide us the opportunity nor the analytical framework to make such a declaration, and it is unnecessary to our conclusion that the plan provision at issue was impermissible.

Moreover, there are practical reasons to avoid such a bright line rule. A plan proponent who chooses to deal with a nondischargeable claim in a plan but who proposes less than full payment, with or without a collection injunction, might include favorable provisions to induce the holder of a nondischargeable claim's acquiescence. For example, a plan might provide a higher interest rate for such a claim, or a substantial "up front" payment, or it might offer security for payment not previously available to the holder of a nondischargeable claim. Any of these potential favorable treatments might convince the holder of a nondischargeable claim that it is better off taking the proposed treatment than spending its postconfirmation time and money levying or executing against the reorganized debtor's assets. A bright line rule requiring full payment would remove the incentive for negotiating such plan provisions.

-19-

Under these circumstances, it would be inappropriate to announce a bright line rule requiring full payment for nondischargeable claims through any plan of reorganization.  What we can say is that a plan that purports to enjoin holders of nondischargeable claims while not paying them, and leaving them worse off economically at the end of the plan, without even an articulated basis for payment, is essentially a plan that ensures non-payment.  As such, it runs afoul of Mercado and Brotby, and there is no basis on which to craft a standard for the confirmation of such a plan.

For these reasons, the bankruptcy court erred as a matter of law in approving the collection injunction provision of the Plan.

**B.    The bankruptcy court erred in finding that the Plan was feasible.**

Under § 1129(a)(11), to be confirmed, the court must find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan . . . ."  Feasibility may be established by the showing of a reasonable probability of success.  "The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11), so long as adequate evidence supports a finding of feasibility."  In re Brotby, 303 B.R. at 191-92 (citations omitted).  Some courts have concluded that the feasibility requirement includes an analysis of whether the plan will enable the debtor to emerge from bankruptcy as a "viable entity."  In re Union Financial Services Group, Inc., 303 B.R. 390 (Bankr. E.D. Mo. 2003).  See also In re Valley View Shopping

Ctr., L.P., 260 B.R. 10, 33 (Bankr. D. Kan. 2001) ("Will the reorganized debtor emerge from bankruptcy solvent and with a reasonable prospect of success?").

In its tentative ruling for the July 21, 2017 hearing, the bankruptcy court found the Plan to be feasible based on Debtors' and HCC's financial projections attached to the Plan. The court also found that any tax liabilities of Debtors or HCC arising from HCC's indemnification obligations to Mr. Hamilton for the Elite Judgment and attendant professional fees and costs would not impact feasibility.

Given our conclusion that it was error to approve the collection injunction provision when the Plan did not provide for any meaningful payment of Appellants' nondischargeable claims, it follows that the Plan as proposed is not feasible. There is simply not enough money or property committed to the Plan to satisfy the nondischargeable claims. But even if the collection injunction were permissible, the bankruptcy court erred in finding the Plan feasible given that the amount owed on the nondischargeable claims would have grown, not diminished, during the Plan term. The bankruptcy court did not give sufficient consideration to whether the Debtors would be economically viable at the end of the Plan. Cf. Sherman v. Harbin (In re Harbin), 486 F.3d 510, 517-18 (9th Cir. 2010) (a bankruptcy court cannot adequately determine a plan's feasibility without evaluating whether a potential future judgment may affect the debtor's ability to implement its plan). In the absence of any evidence of how Debtors intend to deal with the Elite Judgment, it is highly questionable that confirmation would not be followed by

-21-

the need for liquidation or further reorganization.  Accordingly, the record does not support the bankruptcy court's finding of feasibility, and we must reverse.

**C.   The bankruptcy court clearly erred in finding that the plan was proposed in good faith as required by § 1129(a)(3).**

To be confirmed, a plan must be "proposed in good faith and not by any means forbidden by law."  § 1129(a)(3).  "A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code."  Platinum Capital, Inc., v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.), 314 F.3d 1070, 1074 (9th Cir. 2002) (citation omitted).  In determining good faith, the bankruptcy court is to consider the totality of the circumstances.  Id.  "The test is whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis."  Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994).

As discussed above, the Plan essentially neuters the rights of Appellants, in light of the collection injunction and the fact that the Plan provides no meaningful distribution to Appellants on their nondischargeable claims.  In our view, a plan that enjoins collection of a non-dischargeable debt for five years and results in the debtor owing more at the completion of the plan than was owed on the effective date does not constitute an attempt to effect a speedy, efficient reorganization.  Under these circumstances, the bankruptcy court's good faith finding was implausible, illogical, and unsupported by the record.

In addition, for reasons that are not clear from the record,

the relationship between Mr. Hamilton and HCC was never fully explored.[12] At the May 17, 2017 hearing, the bankruptcy court expressed concern about Mr. Hamilton's relationship with HCC:

> [F]acially, it's a curious arrangement. We have Mr. Hamilton's mother saying in deposition she doesn't know how it works and doesn't run it and Mr. Hamilton runs it. . . . A separate question though is whether HCC is Mr. Hamilton's alter ego. . . . And here I think we need to get to the bottom of that because it goes directly to good faith. . . . [i]t may mean that there's other money being earned by HCC that could be available to Mr. Hamilton; it could mean that Mr. Hamilton is keeping property for himself if it's an alter ego; and it goes directly to good faith. So I think Elite's request that there be discovery on that makes sense.

The court was concerned that HCC might have the ability to generate additional value that could be used to pay a higher dividend to creditors: "[W]hat if there's a lot more value in there to be squeezed out of HCC for the benefit of creditors in the next five years? That's what I'm having a problem with." The court took the good faith issue under submission to consider whether to grant Appellants' request for further discovery.[13] But the court eventually concluded that further discovery was unnecessary because

> Elite's allegations ultimately are not an obstacle to plan confirmation. At the time [HCC was formed], Mr. Hamilton was embroiled in litigation with two business partners and so sought another who presumably would be less antagonistic toward him (his mother). Elite provides no evidence that Mr. Hamilton can grow HCC any larger or more quickly at this point. Nor,

---

[12]This relationship is pivotal to confirmation because it impacts not only good faith, but also feasibility and the best interests of creditors as well.

[13]Appellants had conducted a Rule 2004 examination of Mr. Hamilton's mother, Diana Hamilton, in March 2016 but sought to depose HCC's bookkeeper.

-23-

given the Thirteenth Amendment, can he be compelled to work any harder than he is willing. HCC projects approximately $2 million in annual revenues to start. If Mr. Hamilton does not want to apply himself to increase that total, he will share in creditors' pain. That is, there will be less money for both himself and his creditors. But he cannot be obliged to work against his will.

The bankruptcy court's allusion to the Thirteenth Amendment misses the point. Appellants were not suggesting that Mr. Hamilton should be compelled to work harder to generate more revenue to devote to the Plan. Rather, the purpose of granting Appellants discovery regarding HCC's finances was to determine whether there was more value that could be contributed to the Plan. The circumstances suggest that Mr. Hamilton may be in total control of HCC. The bankruptcy court had earlier acknowledged that this issue went directly to good faith and should have been resolved. To the extent that Mr. Hamilton placed HCC under his mother's control to use it as his instrumentality to frustrate his creditors, this would not merely impact good faith, but would essentially prevent a true evaluation of feasibility and the best interests of creditors test, as it would suggest that the Debtor would be able to manipulate the income available to him to fund his plan. But because these circumstances were never fully explored, the bankruptcy court's good faith finding was not supported by the record.

For these reasons, we must reverse the bankruptcy court's good faith finding.

**D.  The bankruptcy court erred in finding that the new value corollary to the absolute priority rule was satisfied.**

Where, as here, a class of impaired creditors has not accepted the plan, if all other § 1129(a) requirements are met and one class of impaired creditors has accepted the plan, the court, on request of the plan proponent, "shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(b)(1).  For a plan to be fair and equitable, it must, at a minimum, comply with the absolute priority rule, which requires that a dissenting class of unsecured creditors is provided for in full before any junior class can receive or retain any property under the plan.  Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988).  The absolute priority rule applies in individual chapter 11 cases.  Zachary v. Cal. Bank & Tr., 811 F.3d 1191, 1192 (9th Cir. 2016).

Where a plan violates the absolute priority rule, it may still be confirmable if it satisfies the new value corollary to that rule.  Under the new value corollary, allowing old equity to retain an interest does not violate the absolute priority rule if the former equity holders provide new value to the reorganized debtor.  Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship), 115 F.3d 650, 654 (9th Cir. 1997).  To satisfy the new value corollary, former equity holders must offer value under the plan that is: (1) new; (2) substantial; (3) in money or money's worth; (4) necessary for successful reorganization; and (5) reasonably equivalent to the

-25-

value or interest received. Id.; In re Brotby, 303 B.R. at 195.

Recognizing that the new value corollary was initially developed with the corporate debtor in mind, bankruptcy courts have observed that its application in individual chapter 11 cases is difficult and have concluded that the exception should be narrowly construed. In re Davis, 262 B.R. 791, 798-99 (Bankr. D. Ariz. 2001); In re Cipparone, 175 B.R. 643, 644 (Bankr. E.D. Mich. 1994). See also In re Rocha, 179 B.R. 305, 307-08 (Bankr. M.D. Fla. 1995) (noting that it is more difficult for an individual debtor to meet the new value exception because the new value must come from a source other than the debtor); and In re Harman, 141 B.R. 878, 887 (Bankr. E.D. Pa. 1992) (purpose of the new value exception is to encourage equity holders to make capital contributions necessary to allow the debtor's business to survive, a purpose that is generally not applicable to consumer debtors).

Here, the Plan provides that Debtors will retain their equity interest in their Pasadena rental property.[14] Debtors acknowledge that this facially violates the absolute priority rule. But the bankruptcy court found that HCC's $200,000 effective date contribution satisfied the new value corollary. Specifically, the bankruptcy court found that HCC's contribution (i) was "new" because it came from an outside source and not the Debtors; (ii) was "substantial" because it represented more than

---

[14]During the bankruptcy, for purposes of valuing secured claims, the parties stipulated that the Pasadena property was worth $700,000 and was fully encumbered by a consensual lien to Wells Fargo Bank and Appellants' judgment lien. Debtors proposed to retain any future increase in equity.

-26-

ten percent of the unsecured claims; (iii) was in money or money's worth; (iv) was necessary for a successful reorganization because, without it, Debtors would have insufficient funds to pay administrative claims on the effective date; and (v) was reasonably equivalent to – in fact, "greatly exceeds" – Debtors' equity in the Pasadena property.

The bankruptcy court erred in concluding that HCC's contribution was new. The bankruptcy court summarily rejected Appellants' argument that HCC's contribution could not be considered new because HCC was already obligated to pay Mr. Hamilton's legal fees. A contribution is "new" if it becomes an asset in the new entity's balance sheet. Sun Valley Newspapers, Inc. v. Sun World Corp. (In re Sun Valley Newspapers, Inc.), 171 B.R. 71, 78 (9th Cir. BAP 1994). Here, because HCC was previously obligated to pay Debtors' legal expenses, that obligation was already an asset on the Debtors' balance sheet. Thus HCC's commitment to contribute $200,000 on the effective date did not constitute new value.

In addition, as discussed above, Appellants raised a legitimate factual question regarding Mr. Hamilton's relationship with HCC, which the bankruptcy court initially acknowledged but later dismissed as irrelevant. This left unexplored the question of whether the $200,000 was truly being contributed from an outside source. But our critique goes beyond the mere uncertainty left by a failure to resolve this issue. If, as may well be the case, HCC is in actuality completely under the control of the Debtor, and not his mother, then it would follow that HCC is in reality the Debtor's asset and subject to the

claims of creditors. And if that is the case, then there can be no "new value" contribution that would overcome the absolute priority rule and support confirmation of this plan.

For these reasons, the bankruptcy court erred in concluding that HCC's effective date contribution satisfied the new value corollary.[15]

**E.   We will not consider Appellants' argument that the bankruptcy court erred in finding that the Plan satisfied the best interests of creditors test.**

Section 1129(a)(7) requires, with respect to an impaired class of creditors that has not accepted the plan, that the class "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]"

According to Debtors' liquidation analysis, general unsecured creditors would receive nothing in a chapter 7 liquidation, while those creditors are to receive approximately 6.5 percent of their claims under the Plan. Appellants contend that the liquidation analysis is flawed because it does not include indemnity payments from HCC. Appellants did not raise this argument in the bankruptcy court but contend that the Panel should nevertheless consider it, relying on Everett v. Perez (In re Perez), 30 F.3d 1209, 1213-14 (9th Cir. 1994). Although we do have discretion to consider arguments not raised in the

---

[15]We need not address Appellants' arguments that the contribution was not substantial or that it was not necessary for the Debtors' reorganization.

-28-

bankruptcy court, we will not do so where the record requires further development. Id. at 1214. Because this issue was not raised in the bankruptcy court, there was no opportunity for the parties to brief it or for the bankruptcy court to decide it. Accordingly, we will not consider the issue in this appeal.

## CONCLUSION

For the reasons explained above, we REVERSE the bankruptcy court's order confirming Debtors' Plan.